**In re CUBIC WESTERN DATA, INC., a California Corporation,**

v.

**The NEW JERSEY TURNPIKE AUTHORITY, Francis G. Fitzpatrick, Chairman, William Flanagan, Executive Director of the N.J. Turnpike Authority.**

**Civ. A. No. 78–2401.**

United States District Court,
D. New Jersey.

Nov. 16, 1978.

---

Francis X. Crahay, Giordano, Halloran & Crahay, Middletown, N. J., for plaintiff.

Robert N. Wilentz, Wilentz, Goldman & Spitzer, Woodbridge, N. J., for defendants.

## OPINION

BARLOW, Chief Judge.

Gentlemen:

## I. PROCEDURAL HISTORY

On October 5th, 1978, plaintiff, Cubic Western Data, Inc. (hereinafter "Cubic Western"), filed a verified complaint and an application for a temporary restraining order requesting that the defendant New Jersey Turnpike Authority (hereinafter "Authority") be prohibited from awarding a public contract for the installation of a toll revenue and computer system to S.C.I. Systems, Inc. (hereinafter "S.C.I."), which was the company submitting the lowest bid for this project. Cubic Western alleged that S.C.I.'s proposal failed to comply with the bidding specifications set forth by the Authority and that, therefore, the Authority was precluded from accepting S.C.I.'s proposal. On that same date, the Honorable Clarkson S. Fisher issued an order restraining the Authority from awarding the contract to any of the bidders until a final

determination of the legality of S.C.I.'s bid was made.[1] On October 17th, 1978, Cubic Western amended its complaint and sought to have the Authority further enjoined from rejecting any legal bids already submitted and from advertising for rebidding the contract in question. The Court heard the testimony of witnesses and the argument of counsel on October 17th and October 20th, 1978 regarding the instant application for a preliminary injunction.

## II. FACTS

### A. The Bidding Instructions

On June 30th, 1978, the Authority issued an invitation for bids for the installation of a toll revenue and computer system. N.J. S.A. 27:23–6.1 requires the Authority to adopt standing operating rules and procedures involving the advertisement for bids. Accordingly, the invitation for bids was accompanied by a document called "Information for Bidders" (hereinafter "the Instructions", "the bidding specifications") which listed the steps to be taken by an applicant in order to properly file its bid. Section 1.05 of these Instructions states that a Letter of Surety shall be submitted with each bid. In the event that the low bidder on a project refuses to accept the contract awarded to it, this Letter of Surety obligates the surety to pay to the Authority the difference between the low bidder's proposal and the cost of having the work performed by the next lowest responsible bidder. The bidding specifications also require that corporate bidders not incorporated in the State of New Jersey submit a certificate from the Secretary of State of New Jersey certifying that the corporation is authorized to transact business in the state. See § 1.00, par. 4. This document also specifies the grounds upon which a proposal may be rejected by the Authority. For instance, a proposal may be set aside if the Letter of Surety, as part of the Proposal Guaranty, is not enclosed with the bid, see § 1.08(a), or if the prices of the bid are "obviously unbalanced", see § 1.08(b).

---

1. The order has been extended by agreement of the parties on two occasions.

However, the instructions do not list the failure to submit the Secretary of State's "transacting business" certificate as a ground for rejecting the proposal.

At the same time, the instructions also provide that the Authority reserves the right to waive any and all irregularities and technicalities in the submission of the bidding documents. § 1.08, par. 3.

### B. S.C.I.'s Bid

On September 29th, 1978, the Authority opened the bids it had received for this contract. The lowest bid for project R–630b, the particular contract in question, was submitted by S.C.I. Systems Inc. for $6,235,597. Plaintiff Cubic Western Data, Inc. submitted the second lowest bid, for $7,500,216. The difference between these two proposals is $1,264,619. *See* Letter from D. L. Bertagna to Howard S. Heydon dated September 29, 1978, Plaintiff's Exhibit No. 6.

On September 29th, 1978, the date the bids were opened, S.C.I. had not furnished the Authority with either the Letter of Surety or the "transacting business" certificate, as required by the bidding instructions. However, on October 3rd, 1978 the Hartford Accident and Indemnity Company issued a Letter of Surety on S.C.I.'s behalf for the contract in question. The Authority received this letter on October 6th. Also, on October 17th, the Secretary of State issued to S.C.I. the "transacting business" certificate.

### C. Cubic Western's Application for Injunctive Relief

This Court must now determine whether or not the Authority should be preliminarily enjoined from awarding the contract to S.C.I. Cubic Western contends that the Authority should continue to be precluded from taking such action because S.C.I.'s bid did not conform to the Authority's Instructions in three respects; that is, that S.C.I. failed to submit the Letter of Surety as part of its bid by September 29th, 1978;

that the bid also was not accompanied by the "transacting business" certificate; and that S.C.I.'s bid is "obviously unbalanced." In light of the amendment made to the original complaint, we must also consider whether or not the Authority should be enjoined from rejecting any of the original bids which fully complied with the instructions and from reopening the bidding for the contract in question.

### III. DISCUSSION

■ The Third Circuit Court of Appeals has clearly identified the showing required of a moving party to establish his entitlement to a preliminary injunction. Initially, the movant must demonstrate both that he has a reasonable probability of eventual success in the litigation and that he will be irreparably injured *pendente lite* if the relief requested is not granted. *See Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir. 1978). Moreover, even after such a showing has been made the Court must still consider both the possibility of harm to other interested persons from the grant or denial of the injunction, as well as the effect which the decision will have on the public interest. *Id.* We will consider each of plaintiff's contentions in light of the above standard.

### A. Enjoining the Authority from Awarding the Contract to S.C.I.

■ N.J.S.A. 27:23–6.1 sets forth the requirement that the Authority publicly advertise for certain bids exceeding the sum of $2500 and that the public agency specify the terms upon which bids will be received and considered. The Authority established its bidding guidelines in the Information to Bidders document discussed previously. It is firmly established in New Jersey that material conditions contained in such bidding specifications may not be waived. *Terminal Const. Corp. v. Atlantic County Sewerage Authority,* 67 N.J. 403, 411, 341 A.2d 327 (1975).[2] However, it is also clear

---

2. Since the basis of our jurisdiction is diversity of citizenship under 28 U.S.C. § 1332(a)(1), we must look to the law of New Jersey, as pronounced by the State Supreme Court, in deciding the issues before us.

that this rule does not apply to minor or inconsequential conditions. *Id.* In fact, as we have noted, the Instructions provided to all bidders in this case specifically stated that the Authority reserved the right to waive any and all irregularities and technicalities in the submission of bidding documents. Thus, in order to decide if the Authority should be enjoined from awarding the contract to S.C.I. we must determine whether the alleged defects in S.C.I.'s bid constitute irregularities or technicalities which may be waived by the Authority or whether they are a breach of material terms of the bid, and, hence, are non-waivable.

1. *Reasonable Probability of Success on the Merits*

(a) The Letter of Surety

As previously noted, the requirement that each bid be accompanied by a Letter of Surety is designed to protect the Authority from incurring additional expense in having the computer system installed by a second bidder should the low bidder refuse to accept the contract awarded to it. Such a document is but one form of security which bidders on public contracts are required to submit with their proposals.[3] The type of security which is to be furnished is either expressly specified in the applicable statute, *see, e. g.,* N.J.S.A. 40A:11–21 (hereinafter "the Local Public Contracts Law"), or, as in

---

**3.** Other types of security often utilized include "bid bonds" for a certain percentage of the total amount of the bid, *see, e. g., Marvec Allstate Inc. v. Gray & Fear Inc.,* 148 N.J.Super. 481, 372 A.2d 1156 (App.Div.1977), and a certified check for a certain percentage of the bid. *See, e. g., Kensil v. Ocean City,* 89 N.J.Super. 342, 215 A.2d 43 (App.Div.1965).

**4.** The statute with which the great majority of cases have been concerned in this area is the Local Public Contracts Law, N.J.S.A. 40A:11–21, whereas the statute governing this case is N.J.S.A. 27:23–6.1. However, the underlying policy and operation of these statutes are identical, and the parties have not suggested that the statutes differ from each other in any material respects.

**5.** *See, e. g., Terminal Const. Corp., supra,* 67 N.J. at 403, 341 A.2d 327 (failure to receive

the instant case, the public entity is allowed by statute to determine what security, if any, it wishes to require as part of its bidding system. *See* N.J.S.A. 27:23–6.1.[4] These bidding statutes, of which the provisions setting forth the security requirements are an integral part, have a clearly-defined purpose:

> Bidding statutes are for the benefit of the taxpayers and are *construed as nearly as possible with sole reference to the public good.* Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition.

*Terminal Const. Corp., supra,* 67 N.J. at 409–10, 341 A.2d at 330; *Hillside Twsp. v. Sternin,* 25 N.J. 317, 322, 136 A.2d 265 (1957). (Emphasis supplied.)

A review of the case law of New Jersey dealing with these bidding statutes reveals that deviations from the terms of the bidding instructions arise in a variety of contexts.[5] Most importantly, New Jersey courts, on numerous occasions, have been confronted with the question of when a public entity may waive defects in the security submitted by a bidder. In *Terminal Const. Corp., supra,* a case that did not involve a defect in security, the New Jersey Supreme Court summarized the security cases as follows:

> federal government approval of bidder's Affirmative Action plan); *Pucillo v. Mayor and Council of Borough of New Milford,* 73 N.J. 349, 375 A.2d 602 (1977) (failure to submit a bid for each project specified in the contract); *Begraft v. Borough of Franklin,* 133 N.J.Super. 415, 337 A.2d 52 (App.Div.1975) (failure to receive prequalification of state agency); *J. Turco Paving Con. Inc. v. City Council of Orange,* 89 N.J.Super. 93, 213 A.2d 865 (1965) (failure to furnish an affidavit stating the bidder's source of supply for materials to be used). While the case law reflects a wide variety of factual settings, the decisions do not turn on *who* the plaintiff is (*e. g.,* next low bidder, taxpayer, or the public body). *See Hillside Twsp. v. Sternin, supra,* 25 N.J. at 325, 136 A.2d 265.

Our courts have on a number of occasions considered whether particular conditions might or might not be waived. Hence, while *the submission of security* with a bid is material and may not be waived, *Hillside, supra, the form in which that security is submitted* may vary slightly from that set forth in the specifications. *Terminal Const. Corp., supra,* 67 N.J. at 411, 341 A.2d at 331 (other citations omitted) (emphasis supplied).

In this case, it is undisputed that S.C.I.'s bid was not accompanied by the required Letter of Surety. At least on its face, the above quotation from *Terminal Const. Corp.* seems dispositive of this case. Thus, for the Authority to successfully resist Cubic Western's claim, it must distinguish away the impact of the statement contained in *Terminal Const. Corp.* We perceive of two methods for making such a distinction: First, it could be argued that the above language of *Terminal Const. Corp.,* being dicta, does not accurately reflect the current rule of law in New Jersey; or, second, assuming that *Terminal Const. Corp.* does correctly restate the rule, its applicability to the instant case is modified by the Appellate Division's holding in *Marvec Allstate, Inc. v. Gray & Fear, Inc.,* 148 N.J.Super. 481, 372 A.2d 1156 (App.Div.1977), which allows a bidding deficiency to be "cured" in certain circumstances.

(i) The "dicta" argument.

*Terminal Const. Corp.* did not involve a defect in security, and the aforementioned proposition for which the case is cited as authority was stated by the Supreme Court as part of its summary of New Jersey law on the question of bid security. In holding that "the submission of security with a bid is material and may not be waived", the Court referred to the earlier case of *Hillside Twsp. v. Sternin, supra,* 25 N.J. at 317, 136 A.2d 265. *Hillside Twsp.* was a suit by the municipality against the low bidder to recover a monetary loss suffered by it as a result of the bidder's refusal to enter into the contract awarded to him. The bidder failed to furnish the 10% deposit required at the time the bids were opened, but the municipality attempted to hold the defendant to his bid by waiving his failure to provide the security. The New Jersey Supreme Court disallowed the attempted waiver of this term of the bidding specifications, and thereby foreclosed the municipality from recovering against the recalcitrant bidder on any breach of contract claim.

We think it is clear that *Terminal Const. Corp.* correctly stated the holding in *Hillside Twsp.* At this point, we see no justification for departing from the course which the New Jersey Supreme Court has charted for courts applying state law to follow in bid security cases.

■ We emphasize that in *Hillside Twsp.* the township argued that the waiver of the security requirement should be allowed because to hold otherwise would foreclose it from recovering any money damages against the reneging bidder. Notwithstanding the obvious economic advantage to the public body that such a waiver would create, the court refused to allow the township to dispense with this requirement. Similarly, in the present case, allowing the waiver would obviously best serve the financial interests of the Authority. However, in light of *Hillside Twsp.,* we conclude that the New Jersey Supreme Court would require that the Letter of Surety be submitted at the time the bids were opened.

(ii) The "cure" argument.

The essential difference between *Hillside Twsp.* and the present case is that in the former the bidder *persisted* in its refusal to provide any security, even after the bids were opened, whereas, here, S.C.I. eventually procured the Letter of Surety some four days after the bid-opening date. This distinction is significant in that it requires that we determine whether or not the impact of the above-quoted statement in *Terminal Const. Corp.* has been modified in any way by the Appellate Division ruling in *Marvec Allstate, Inc., supra.* This latter case holds that in certain circumstances defects in the security submitted may be "cured" or corrected by the bidder even after the proposals have been opened.

*Marvec* involved bids made pursuant to the Public Contracts Law for the construction of sewer lines. The notice to bidders required that a "bid bond" be posted in the amount of 5% of the total bid, and 5% of the defendant's bid amounted to $122,000. However, defendant submitted a bond limited to a maximum of $20,000, which created a deficiency in the security of $102,000. Within twenty-four hours of the opening of the bids, defendant furnished the public agency with the outstanding balance. The Appellate Division, in reversing the lower court, held that the $102,000 discrepancy in defendant's bid bond was, in fact, a waivable defect. In the course of its opinion, the Appellate Division discussed *Hillside Twsp., supra,* and stated that in that case "the court clearly indicates that any such defect would probably be correctable by the deficient bidder". 148 N.J.Super. at 490, 372 A.2d at 1160. The court then quoted the language from *Hillside Twsp.* which it believed supported its interpretation of that part of *Hillside Twsp.'s* holding.[6] We have serious reservations about the *Marvec* court's interpretation of the language quoted from *Hillside Twsp.,* and remain unconvinced that the New Jersey Supreme Court was in fact stating that a total failure to comply with the security requirements can be corrected after the bids have been opened.[7]

However, even assuming that *Marvec* correctly reads *Hillside Twsp.,* we do not believe that the holding in *Marvec* enables the Authority to allow S.C.I. to "cure" this particular defect. Immediately following

the analysis of *Hillside Twsp.,* the court, in *Marvec,* sets forth two criteria for determining whether an instance of non-compliance with the notice to bidders constitutes a substantial and therefore non-waivable irregularity:

> First whether the defect, if waived, would permit the bidder to withdraw his bid and thus deprive the municipality of its guarantee that the contract will be entered into and performed according to the specifications, and second, whether the defect is of such a nature, if waived, that it would place the recalcitrant bidder in a position of advantage over the other bidders by improperly affecting the established common standards of competition.

148 N.J.Super. at 490, 372 A.2d at 1160. In *Marvec,* the "defect" was that the bidder had furnished a bond in the amount of $20,000 when the statute required him to submit one for a total of $122,000. Thus, even though there was a deficiency in the amount submitted, the bidder was permitted to "cure". Had the bidder withdrawn his bid at any time after the proposals were opened, but before he had "cured", the municipality would *still* have its guarantee that the contract would be entered into since the bidder would forfeit the $20,000.[8] However, in the present case, *no* security whatsoever was submitted by September 29th. We recognize that representatives of S.C.I. were in the process of procuring the Letter of Surety from the Hartford Co. at the time the bids were opened. Affidavit

---

6. The precise language of the *Hillside Twsp.* case referred to in *Marvec* reads:

   However, the claim is that the condition may be waived by the municipality as between itself and the recalcitrant bidder. Both parties concede, at least by plain implication, that the award of the contract to Sternin could have been successfully attacked by a taxpayer or another bidder *(at least before acceptance of the instrument and the posting of a proper performance bond).*

   25 N.J. at 324, 136 A.2d at 268 (emphasis supplied by Appellate Division, 148 N.J.Super. at 490, 372 A.2d 1156).

7. The fact that the court in *Hillside Twsp.* noted parenthetically that a failure to submit the security could be subject to attack at a time

*before* the contract was actually awarded does not therefore also mean that this defect could be corrected by the bidder at any time *thereafter.*

8. In *Marvec,* the municipality would only be entitled to $20,000 and would not have had recourse for the full amount of the bid bond that was actually required. However, the $20,000 bond was in fact the amount originally required by the New Jersey legislature when it enacted N.J.S.A. 40A:11–21. The deficiency was for the amount tacked onto the statute by a federal requirement which was incorporated into the state statute. *See* 148 N.J.Super., *supra,* at 489, 372 A.2d 1156.

of W. Henry Maddox, III, dated October 10, 1978; *see* Affidavit of Wayne T. Hampel, dated October 10, 1978; Affidavit of William J. Hebding, dated October 10, 1978. However, it is clear that their application had not been approved by that date. For instance, the Mailgram from the Hartford Co. to the Authority dated September 29th, 1978, 3:03 p. m., states, in part, that "S.C.I. Systems Inc. is a Hartford Bond Account in good standing and *we are considering* the bond [9] for contract number R–630-decision forthcoming". *See* Plaintiff's Exhibit 3 (emphasis supplied). The Letter of Surety was finally issued on October 3rd and was received by the Authority on October 6th. However, during the interim period from September 29th to October 3rd the Authority had had no "guarantee that the contract would be entered into and performed according to the specifications" by S.C.I. During this "gap", S.C.I. was free to decline to accept the contract without suffering any economic penalty whatsoever. We believe that there is a substantial difference between the presentment of security, albeit in a deficient amount,[10] and no security at all. Thus, the first criterion of the *Marvec* standard has been met.[11]

The second part of the *Marvec* analysis leads us to determine whether or not the Authority's waiver of the timely filing of the Letter of Surety requirement placed S.C.I. "in a position of advantage over the other bidders by improperly affecting the established common standards of competition". In so doing, we should be guided by the underlying policy of the bidding statutes. *Marvec Allstate Inc., supra,* 140 N.J. Super. at 490, 372 A.2d 1156. The classic statement of this policy is contained in *Terminal Const. Corp., supra,* 67 N.J. at 403, 341 A.2d 327, a part of which has been quoted earlier. We now set forth the entire text of that statement so that its meaning can be accurately applied to this case:

Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes *all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited,* and all awards made or contracts entered into where any such practice may have played a part, will be set aside. *This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.*

67 N.J. at 409–10, 341 A.2d at 330. (Emphasis supplied.) Thus, Cubic Western need not show that the instant waiver provided S.C.I. with an *actual* competitive advantage. Instead, it must demonstrate that the waiver is "likely to affect adversely" the established common standards of competition.

We do not believe that the waiver resulted in any palpable economic benefit to S.C.I. The Authority has successfully established that the cost of procuring a Letter of Surety is minimal and that such cost would not be a factor in a bidder's computation of its finalized proposal. *See, e. g.,* Testimony of Raymond L. DeKozan, October 17, 1978. Cubic Western does not seri-

---

**9.** There was testimony at the hearing held on October 17th that the applications for a Letter of Surety and a Performance Bond are considered jointly. The Authority has not asserted that the Mailgram's reference to "the bond" pertained to a document other than the Letter of Surety.

**10.** This is especially true where, as in *Marvec* itself, the deficiency was not in the amount of guarantee specifically required by the state but was due to a *Federal* provision engrafted into the state statute. *See* n. 8, *supra.*

**11.** We do not attach any significance to the *length of time* during which the public entity is without its guarantee. A low bidder can renege on the award immediately following the opening of the bids just as it can refuse to perform several days later. Thus, we do not base our decision of this issue on the fact that the "gap" in this case was four calendar days whereas it was less than twenty-four hours in *Marvec.*

ously contest this assertion. However, we do find that the standards of competitive bidding are likely to be adversely affected in another significant way.

We are of the opinion that the waiver of such a requirement allows the announced low bidder to negotiate with the public agency after the bids are opened, up until the time this bidder actually procures the Letter of Surety, if it does so at all. Once the agency has announced who the low bidder is, the former is understandably susceptible to any overtures made by the bidder to discuss possible alterations in the terms of the contract. Naturally, the agency wants the low bidder to accept the award and thereby have the work performed for the lowest possible price. The temptation to "dicker" with the bidder seems real.[12]

Similarly, the advantages which the bidder in this situation receives are genuine. As Cubic Western has indicated in its Reply Brief, at page 25, this bidder has, among other advantages, an opportunity to examine the other bids to determine why its bid was low, whether or not it had made any costly, non-recoverable errors in its calculations, and whether additional or extra work would be authorized. In short, the bidder may wait until after the proposals have been opened and after it has had an opportunity to negotiate with the agency *before* deciding whether or not to submit the Letter of Surety and thereby become obligated to accept the contract.

The likelihood of the above scenario actually occurring is demonstrated by the events which have taken place in the instant case. Between September 29th, when the bids were opened, and October 6th, the date the Authority received the Letter of Surety, representatives of S.C.I. and the Authority conferred to discuss the terms of the contract. The testimony of William Rohde, Senior Engineer of the Authority,

given on October 17th, indicates that the cost estimates for the project were discussed. It may well be, as Mr. Rohde stated, that the purpose of these conferences was for S.C.I. to assure the Authority that it could actually complete the project for the markedly low cost specified in its proposal. Still, it is not disputed that one result of these interim negotiations was that the Authority made an upward readjustment in the contract price for the proposed "Lane Controller", Item No. 10 of the project. *See* Letter from Olarsch to King, dated October 6, 1978, Plaintiff's Exhibit No. 5. It appears that the cost stated in numerical figures differed from the cost specified in the written version of this item. The Authority agreed to the higher cost version. This alteration increased the total cost of the project by approximately $106,-000.

There is no indication that S.C.I. deliberately caused the ambiguity in the dual listing of the price of this item to enable it to use its leverage as the low bidder to coerce the Authority into accepting the higher of these two figures. Yet it need not be shown that the modification was induced by fraud of any kind. A low bidder who has not furnished a Letter of Surety at the time the bids are opened has an opportunity to continue to negotiate the terms of the contract with the public agency, an opportunity not enjoyed by his competitors. Clearly, the alteration of price terms made in the instant case demonstrates how the waiver of the Letter of Surety requirement can disrupt the even balance of competition among the various bidders.[13] We find, then, that the second criterion of *Marvec* has also been met and that, even assuming *Marvec* has modified the impact of *Terminal Const. Corp.* in any way, the Letter of Surety was a non-waivable term of the bidding instructions.

12. Counsel has not pointed to, nor are we aware of, any statute or regulation which prohibits the Authority from engaging in such post-bid-opening discussions.

13. Assuming that *no* interim negotiations took place in this case, it may well be that the Authority would still have decided that the con-

tract price should reflect the higher of the two figures submitted for this item. However, the likelihood that a public body would allow modifications of the contract's terms *after* having conducted discussions with the low bidder continues to exist.

In view of the fact that we have determined that Cubic Western enjoys a reasonable likelihood of success on the merits of this case by reason of S.C.I.'s failure to submit a Letter of Surety with its bid, we need not address the plaintiff's other contentions; first, that S.C.I. failed to submit a certificate that it was authorized to do business in New Jersey and, second, that its bid was "obviously unbalanced". We do note, however, that the failure to submit a "transacting business" certificate was not a material condition and was, therefore, waivable; and, further, that the plaintiff's contention that the S.C.I. bid was "obviously unbalanced" was not proven.

### 2. *Irreparable Injury*

I am satisfied that the irreparable injury which Cubic Western would suffer in the absence of an injunction is self-evident. The Authority has clearly indicated its intention to award the contract to S.C.I. should the instant litigation be resolved in the Authority's favor. *See* Letter from Olarsch to King dated October 6, 1978, Plaintiff's Exhibit No. 5. The economic gain which Cubic Western would derive from being the successful bidder would be lost. We recognize that under the facts of this case this loss of potential profit may be fairly ascertained and that, accordingly, Cubic Western may have an adequate legal remedy. However, Cubic Western would also lose the opportunity to enhance its reputation in the computer systems field, as well as be deprived of a means of improving its job performance should we deny its application. Injury in these two forms cannot be easily compensated for in money damages.

Conversely, the Authority will not be irreparably harmed by the granting of this part of plaintiff's claim for injunctive relief. While the Authority would stand to make a potentially substantial savings should it be allowed to award the contract to S.C.I., we would not be forever preventing the Authority from doing so.[14]

### 3. *Potential Harm to Third Parties*

S.C.I. is a third party whose interests will obviously be affected by our decision, as it has bid for this project with the expectation that it may realize a financial profit from being named the low bidder and performing the work. However, since we have also determined here that the Authority should not be enjoined from readvertising the contract, we assume that the Authority will proceed with its plan to conduct re-bidding. Thus, S.C.I. will have an opportunity to submit a second bid if it so desires. We also emphasize that by granting this phase of the request for relief we are not requiring the Authority to award the project to another bidder. Thus, were we to issue an injunction, S.C.I. would not necessarily be denied an opportunity to improve its reputation in the field or be deprived of a chance to perfect its job operation, whereas these adversities would befall Cubic Western should the injunction be denied.

### 4. *The Public Interest*

We also believe that Cubic Western has demonstrated that the public interest would best be served by enjoining the Authority from awarding the contract to S.C.I. First, by permitting the waiver of the Letter of Surety requirement we would be encouraging inefficiency by bidders. We would be allowing them to disregard the clearly-stated terms of public contract bidding instructions when the very cornerstone of the system is uniform compliance with such requirements.

Inefficiency within the public entity itself would also result as the municipality or other body would delay its decision on the award of the bid until the conditions which it deemed to be waivable had been complied with. Such delays could become lengthy, especially when there is a defect in the security. In these cases, the public body must depend upon the promptness with

14. In light of our decision on Cubic Western's request to have the Authority enjoined from readvertising for this contract, it is possible that similarly advantageous bids will be submitted during re-bidding.

which the bonding company, a party over which it has no control, can complete its action.[15]

Moreover, permitting this waiver would be detrimental to the public interest in that it would discourage competent bidders from submitting proposals. There would be engendered in the public contracting community a feeling that the effort of submitting a faultless proposal may not be worth the potential benefits of being selected the low bidder, since a bidder who has failed to comply with an obviously material condition may nonetheless be awarded the contract. Every bidder is entitled to have assurances that the public body is requiring that the bidder's competitors supply the same documents in the same time frame.

The general citizenry is also entitled to a guarantee that public contracts are being awarded on the basis of full compliance with the bidding guidelines. Public confidence in this system would be eroded if entities were allowed to subjectively determine that the deadline for submitting the required security could be extended for certain bidders.

We recognize that the purely economic interests of the public [16] would benefit most by allowing the Authority to award the contract to S.C.I., since its bid was approximately $1,264,619 less than the nearest competitor, Cubic Western. However, as we have stressed throughout this opinion, bidding statutes are based upon strong public policy, and we do not believe that cases such as this can be decided by simple dollar comparisons. See *Hillside Twsp., supra,* 25 N.J. at 327, 136 A.2d 265; *but see Marvec Allstate Inc., supra,* 148 N.J.Super. at 492, 372 A.2d 1156. After careful consideration, we conclude that this potential economic

benefit does not outweigh the tangible adverse impact which a waiver of this type has on the competitive bidding system.[17]

### 5. *Conclusion*

█ We have discussed each of the four factors to be considered in passing upon the application for injunctive relief since no one aspect will necessarily determine the outcome. *Constructors Assn. of Western Pennsylvania, supra,* 573 F.2d at 815. Having balanced all of these elements, we conclude that the Authority must be preliminarily enjoined from awarding the contract to S.C.I.

### B. *Enjoining the Authority from Readvertising for Bids for the Contract*

The second part of Cubic Western's application seeks to have the Authority enjoined from seeking new bids for the contract. Cubic Western contends that since one of the original bidders submitted a proposal which complied with all the bidding specifications the Authority must award the contract to it, and that the Authority is powerless to set aside the original bidding by allowing the project to be readvertised. It appears that Cubic Western was the only bidder which both fully complied with the bidding instructions and submitted a proposal for an amount less than the Authority Engineer's estimate. Thus, by enjoining the Authority from rejecting any lawful bids, we would, in effect, be requiring the Authority to award the contract to Cubic Western.[18]

### 1. *Reasonable Probability of Success on the Merits*

Cubic Western maintains that the Authority failed to reserve for itself the right

15. The Affidavit of Alex J. Campbell, filed October 17, 1978, indicates that a decision on an application for a bond is normally made within two to five working days of receipt; *supra,* at par. 4. Even longer delays are conceivable.

16. The New Jersey Turnpike Authority is an instrumentality of the State of New Jersey. *See* N.J.S.A. 27:23–3(A).

17. It may be reasonably anticipated that at least one of the bids submitted during the readvertising procedure will be similarly advantageous to the Authority.

18. The Amended Complaint does not specifically request that the Authority be ordered to award the contract to Cubic Western, but it is clear that this would be the net result of a decision to enjoin the Authority from readvertising.

**70**

to reject all bids, and that, even if the Authority is deemed to have the inherent power to reject, that it did not exercise this right in good faith.

■ It cannot be disputed that the Authority may specifically reserve the right to reject any and all bids submitted on a contract even though the statute governing its bidding procedures, N.J.S.A. 27:23–6.1, does not expressly grant it this right. *See M. A. Stephen Const. Co. v. Bor. of Rumson*, 117 N.J.Super. 431, 436–37, 285 A.2d 55 (App. Div.1971). Moreover, we believe that the Authority did make such a specific reservation. Section 1.08(j) of the bidding instructions states:

In addition, Proposals may be rejected:

. . . . .

(j) if it is deemed advisable to do so in the best interest of the Authority.

This provision was not meant to cover only those bids which, on an individual basis, should be rejected. If that were the case, the provision would have read: "In addition a *Proposal* may be rejected . . ." The use of the term "Proposals" requires that we conclude that *all* of the bids could be rejected if the Authority deemed it advisable.[19]

■ Even if the Authority had not made this reservation, the law in New Jersey clearly states that a public body such as the Authority has the inherent power to reject all bids under proper circumstances. *Cardell, Inc. v. Twsp. of Woodbridge*, 115 N.J. Super. 442, 450, 280 A.2d 203 (App.Div. 1971), *cert. denied* 60 N.J. 236 (1972). As the court noted in that case:

No . . . governing body could effectively engage in competitive bidding without such power. At the very least, the existence of the possibility of total rejection of bids serves as a strong in-

ducement to bidders to keep their bids as low as circumstances permit.

115 N.J.Super. at 450–51, 280 A.2d at 207.

■ However, it is equally well settled that regardless of whether this power is inherently derived or reserved by express grant, it may only be exercised when the governing body concludes in good faith that the purposes of the public bidding statute are being violated. *Id.* at 451, 280 A.2d 203; *M. A. Stephen Const. Co., supra*, 117 N.J. Super. at 437, 285 A.2d 55. Bestowing upon such entities the unfettered right to reject all bids, even where such right is included in the bidding instructions, would encourage favoritism.

■ We conclude that Cubic Western has not shown that the Authority's decision to reject all bids and readvertise the contract was not made in a good faith belief that the purposes of the bidding statute were being violated. We re-emphasize that statutes requiring competitive bidding are for the benefit of taxpayers, not for the benefit or enrichment of the bidders. Such statutes are construed with sole reference to the public good. *Trap Rock Industries v. Kohl*, 59 N.J. 471, 479, 284 A.2d 161 (1971). An established purpose of such statutes is to protect the public from unnecessarily high costs in the performance of public contracts. In this case, a comparison of the bids submitted indicates that the difference between S.C.I.'s low bid and that of Cubic Western amounted to approximately $1,264,000. Clearly, to enjoin the Authority from readvertising this contract and to thereby compel it to accept Cubic Western's bid would result in the expenditure of a vast sum of public money over and above what is theoretically necessary to complete the project. We believe that it was reasonable for the Authority to conclude, in good faith, that the goal of securing the lowest bid possible would be violated if it were to award the contract to Cubic Western at this particular time.[20]

---

**19.** Perhaps a more precise statement could have been drafted so as to eliminate any doubt as to the Authority's intent in this regard.

**20.** The testimony of William Rohde at the October 17th, 1978, hearing indicates that Cubic

Western's bid was "unbalanced" in some respects. While the Authority has not maintained that Cubic Western's proposal should be rejected on this basis, this is further evidence that the Authority was not acting arbitrarily or capriciously in refusing to award the project to Cubic Western.

We recognize that to allow the rejection of all bids where, as here, there is one proposal which complied with all the specifications and was below the public body's own cost estimate, has the potential for discouraging competent bidders from submitting proposals. However, we believe that in this case the Authority has a bona fide expectation that rebidding will result in a substantial savings to the State Treasury. In *Cardell, Inc., supra,* the municipality had no reason to believe that a readvertisement of the contract could produce lower bids. 115 N.J.Super. at 446, 280 A.2d 203. However, here the bid of S.C.I. serves as irrebuttable evidence that a rebid could bring in a significantly lower best proposal.

We conclude that Cubic Western has not met its burden of demonstrating that the Authority's decision to reopen the bidding was not made in good faith, and, thus, it has not shown a reasonable probability that it would prevail on this claim.

### 2. *Irreparable Injury*

Denying this form of injunctive relief will not result in any irreparable harm to Cubic Western since all prospective bidders have an equal opportunity to submit new proposals. We have merely decided to return the parties to the state of affairs which existed immediately prior to the opening of the bids on September 29th.

### 3. *Potential Harm to Third Parties*

Granting Cubic Western's instant application would foreclose bidders who took part in the original bidding from resubmitting proposals, as well as deny any new bidders an opportunity to participate in the bidding competition. This fact is an additional, albeit less significant, reason why the Authority should not be enjoined from readvertising the contract.

### 4. *The Public Interest*

More importantly, permitting the Authority to reopen bidding for this project will result in the contract being performed at the lowest possible cost to the Authority and, therefore, to the State of New Jersey. On the other hand, if the relief Cubic Western seeks here is granted, any economic benefit potentially derived from the competitive bidding system would be circumvented, since the Authority would be forced to engage a contractor whose bid exceeds that of the original lowest bidder by more than $1,000,000.

### 5. *Conclusion*

Having considered the four above elements of Cubic Western's application, we conclude that the Authority should not be preliminarily enjoined from readvertising the contract.

The above constitutes this Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). The plaintiff will submit an appropriate order.