**REGIONAL SCAFFOLDING &
HOISTING CO., INC.**

v.

**CITY OF PHILADELPHIA et al.**

**Civ. A. No. 84–1826.**

United States District Court,
E.D. Pennsylvania.

May 25, 1984.

Angelo J. Genova, Baumgart & Genova, East Orange, N.J., for plaintiff.

Janet Stern Holcombe, Asst. City Sol., City of Philadelphia, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff Regional Scaffolding & Hoisting Co., Inc. ("Regional"), a New York corporation, seeks a preliminary injunction pursuant to Fed.R.Civ.P. 65 preventing the defendants (the City of Philadelphia; the City's Director of Finance, Richard Gilmore; the Minority Business Enterprise Council of the City of Philadelphia (MBEC); Albert Childs, Deputy Director of Finance

and Staff Director of the MBEC; and Warren Eisenberg, Commissioner of the Department of Procurement) from commencing to rebid, rebidding, and awarding the City contract for the scaffolding work on the City Hall restoration project (Project No. 20–001–2–231) until the issues resolved in this action between the plaintiff and the defendants are finally determined by the Court. Regional has filed this diversity action challenging the City's decision to reject all the bids for the scaffolding work on the City Hall restoration project. At the time the suit was filed Regional sought a temporary restraining order enjoining the City defendants from rebidding or otherwise awarding the contract for the project at issue. The parties entered into a stipulation in connection with Regional's application for a temporary restraining order agreeing to maintain the status quo by not advertising for new bids or otherwise awarding the contract until the plaintiff's motion for a preliminary injunction is determined. In addition to its motion for a preliminary injunction, Regional's complaint seeks permanent injunctive relief in the form of an order compelling the City to accept an amendment to Regional's bid in the form of a substitution of "certifiable" minority-owned and female-owned subcontractors in lieu of those originally included in Regional's bid. On Friday, April 27, 1984, a hearing was held before this Court on Regional's motion for a preliminary injunction. For the reasons set forth below, Regional's motion for a preliminary injunction will be denied.

The Court makes the following findings of fact based upon the evidence presented at the preliminary injunction hearing. Regional is a New York corporation which installs, maintains, and constructs scaffolding, personnel and equipment hoists. Regional is authorized to do business in the Commonwealth of Pennsylvania, and was engaged in contracting or subcontracting work in the City of Philadelphia during the years 1981, 1982, and 1983. Regional filed tax returns with the Commonwealth of Pennsylvania for the years ending in June of 1982 and June of 1983. As a result of the work which Regional performed in Philadelphia in 1981–1983, it incurred tax obligations to the City of Philadelphia for those periods. Regional has directed the payment of the taxes due and owing to the City of Philadelphia.

Regional first submitted a bid for the scaffolding and hoist work on the City Hall restoration project in the late winter or early spring of 1983. For reasons not relevant here the City rejected all the bids submitted and advertised for new bids. Regional submitted a new bid in the fall of 1983 on the City Hall project (Bid No. 4781), which is the bid at issue in this case. Regional was one of four bidders on the project. When the bids were opened on October 20, 1983, Regional was the low bidder on the project. No award was made pending "certification" by the MBEC of the proposed minority subcontractors submitted by Regional and the other bidders.

With respect to such minority subcontractors, all bidders were required to submit a "Schedule for Participation" listing sub-contractors with whom the bidder intended to contract in order to comply with Chapter 17–500 of the Philadelphia Code, which became effective August 12, 1983. Chapter 17–500 requires, *inter alia*, that all construction contracts of the City of Philadelphia reflect participation of at least fifteen percent minority-owned businesses (hereinafter referred to as "MBE's", *i.e.*, "minority business enterprises") and ten percent female-owned businesses (hereinafter referred to as "WBE's"). The instructions in the bid package for prospective bidders contained the following pertinent language in connection with MBE and WBE participation:

(1) YOU ARE COVERED BY THE PROVISIONS OF CHAPTER 17–500 AND THE REGULATIONS PROMULGATED THEREUNDER, AND ARE REQUIRED TO MEET THE GOALS OF FIFTEEN PERCENT (15%) PARTICIPATION BY MINORITY OWNED BUSINESSES AND TEN PERCENT (10%) PARTICIPATION BY FEMALE OWNED BUSINESSES IN THIS CON-

TRACT, AS THOSE ITEMS ARE DEFINED IN CHAPTER 17–500 AND THE REGULATIONS UNLESS YOU ARE GRANTED A WAIVER.

(c) ANY FIRM THAT IS LISTED IN THE SCHEDULE FOR PARTICIPATION MUST BE CERTIFIED IN ACCORDANCE WITH CHAPTER 17–500 AND THE REGULATIONS BEFORE THE TIME OF AWARD IN ORDER TO BE CONSIDERED AS MEETING THE REQUIREMENTS OF THIS CONTRACT FOR MINORITY AND FEMALE OWNED BUSINESS PARTICIPATION.

(e) THE SUBMISSION OF A SCHEDULE FOR PARTICIPATION OR A REQUEST FOR WAIVER WITH THIS BID IS AN ELEMENT OF RESPONSIVENESS TO THE BID, FAILURE TO SUBMIT A COMPLETED SCHEDULE OF PARTICIPATION OR REQUEST FOR WAIVER WILL RESULT IN REJECTION IN YOUR BID.

*Schedule for Participation*

1. Only minority and female owned businesses certified pursuant to Part 4 § 4.1 of the Regulations may be counted for participation pursuant to this program. If you are a certified minority or female owned business, you may be listed on the Schedule for Participation to obtain the required contract goals. All certifications must be completed prior to award of the contract. Listing a minority or female owned business on the Schedule For Participation shall constitute a representation that such certified minority or female owned business is available and capable of completing the work with its own work force. Such a listing is also a commitment by the bidder that, if it is awarded the contract, it will enter into a subcontract with the firm for the portion of the work listed at the price set forth in this bid submission.

(4) Notwithstanding compliance with these requirements set forth in this section, the Procurement Commissioner reserves the right to reject any or all bids as he may deem for the best interest of the City.

Regional was aware of all of the instructions quoted above at the time it submitted its bid package.

The above-noted instructions regarding the Chapter 17–500 requirements were contained in a section of the bid package captioned "MBEC PROGRAM—CONTRACT LANGUAGE FOR PUBLICLY BID CITY CONTRACTS". Also contained in the bid materials (but not included within the MBEC Program section) was the following provision found in the "Special Contract Requirements" section:

SUBCONTRACTS AND SUBCONTRACTORS

A. Each Prime Contractor shall, within thirty (30) days after the execution of his Contract and before any agreements with Sub-Contractors are made, notify the Director in writing of the names of all Subcontractors and/or Material Suppliers proposed for the various parts of the Work.

B. Submit list in original and four (4) copies. All Sub-Contractors shall be approved in writing by the Special Engineer and the Director. Employ no Sub-Contractors without this written approval.

The bid instructions permitted a bidder to submit the names of uncertified MBE and WBE subcontractors in its Schedule for Participation, with the proviso that any such firms listed in the Schedule would be required to be "certified" by the MBEC prior to the time of the award. This procedure was adopted because at the time Chapter 17–500 was enacted a large pool of "pre-certified" minority- and female-owned businesses did not exist, and therefore the City believed that at least in the early stages of the program it would be necessary to allow bidders to submit the names of uncertified subcontractors subject to certification by the MBEC before any final award was issued.

In order to be "certified", an MBE or a WBE must demonstrate to the MBEC staff that it is owned, controlled, operated, and

managed by persons who fall within the relevant category (*e.g.*, "minority"-owned, which includes blacks, Hispanics, Asian-Americans, American Indians, and Native Alaskans, and "female"-owned). If a firm has not been previously certified by the MBEC and has not been certified by other programs deemed acceptable by the MBEC (*e.g.*, SEPTA, the Washington, D.C. Department of Transportation, the Small Business Administration, etc.), the MBEC staff must determine whether or not to certify the firm. Often personal interviews or hearings are required in order to verify that the firm is at least 51% owned by a person of the requisite ethnic or racial heritage or gender. Hearings may also be required in order to verify that the individual or individuals represented to be the owners of the firm in fact are capable of controlling and managing the operation of the firm. The certification process on any one bid may take several months and has caused significant delays in the awarding of City contracts.

Regional submitted with its bid package a Schedule for Participation listing Accurate Fence, Inc. as a minority-owned subcontractor participating in fifteen percent of the total contract, and listing Inch Equipment Co. ("Inch") as a female-owned business participating in ten percent of the total contract. Accurate Fence and Inch were not certified as minority- or female-owned businesses by the Philadelphia MBEC at the time Regional submitted its bid, although Regional expected that both firms would be certified as minority- and female-owned businesses.

Neither Accurate Fence nor Inch submitted timely information to the MBEC in connection with the MBEC's certification process. However, following some communication between the City, Regional, Accurate Fence, and Inch, Accurate Fence and Inch were permitted to submit the necessary information to the MBEC and to proceed with the certification process in March of 1984. Shortly thereafter, on March 20, 1984, each subcontractor was requested to appear before the MBEC on March 21, 1984, to provide additional information in support of their applications for certification. Accurate Fence advised Regional that it no longer desired to perform on the project and would not participate further in the certification process. On March 21, 1984, Regional's president, Michael Mazzucca, requested that Regional be permitted to substitute another MBE subcontractor in lieu of Accurate Fence. Albert Childs, Deputy Director of Finance and Staff Director of the MBEC, informed Mazzucca that MBEC policy did not permit substitution of MBE or WBE subcontractors listed in a bidder's schedule for participation in the event one of the subcontractors so listed withdrew from the project prior to the award or failed to become certified by the MBEC.

The regulations promulgated under Chapter 17–500 do permit substitution of subcontractors in the event that a *certified* subcontractor withdraws from the project *after* the contract has been awarded. Although bidders have requested the MBEC to substitute subcontractors after a listed subcontractor failed to achieve certification, no such substitutions have so far been permitted.

After Childs informed Mazzucca on March 21, 1984 that MBEC policy did not permit substitution, Childs determined that Accurate Fence could not be certified without a hearing. Since Accurate Fence did not attend its scheduled hearing, and since Childs had been told that Accurate Fence was withdrawing from the project, Childs determined that Regional's bid was not in compliance with the requirements of Chapter 17–500, and that therefore Regional was ineligible for the award for Bid No. 4781. Two of the remaining three bidders on Bid No. 4781 were also determined to be ineligible for the award of the contract because of non-compliance with the requirements of Chapter 17–500. The City Procurement Department determined that the only bid which met the requirements of Chapter 17–500 was unreasonably high in price. On April 3, 1984, all bids submitted on Bid No. 4781 were rejected. A "no award" notice was made available for pub-

lic inspection. The Procurement Department did not serve personal notice of the bid rejection on Regional. Inch Equipment Co. was uncertified by the MBEC but was under consideration for certification at the time the bids on Bid No. 4781 were rejected, and Inch remains under consideration for certification by the MBEC at this time.

Regional seeks a preliminary injunction contending that the defendants acted arbitrarily in refusing to permit Regional to substitute subcontractors to fulfil the requirements of Chapter 17–500, in rejecting Regional's bid for non-compliance with those requirements, and in rejecting all bids for the project at issue.

Based on the evidence presented at the hearing, this Court has determined that Regional has failed to show that it is entitled to a preliminary injunction against the defendants.

■ In order to obtain a preliminary injunction, the moving party must demonstrate (1) a reasonable probability of eventual success in the litigation, and (2) that the movant will be irreparably injured pendente lite if relief is not granted. While the burden rests upon the moving party to make these two requisite showings, the district court must also take into account whenever relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest. *See Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980); *Constructor's Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978); *Association of American Medical Colleges v. Mikaelian, et al.*, 571 F.Supp. 144, 149 (E.D.Pa.1983), *aff'd mem.* 734 F.2d 6 (3d Cir.1984). In deciding a motion for a preliminary injunction, the district court has broad discretion since its task involves balancing the benefits and burdens that granting or denying the injunction will have on each of the interested persons and the public. *See Continental Group, Inc. v. Amoco Chemical Co.*, 614 F.2d at 357; *Penn Galvanizing Co. v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir.1972).

■ The defendants contend preliminarily that Regional lacks standing to challenge the City's rejection of the bids because Regional is not a Philadelphia taxpayer. Under Pennsylvania law it is well-established that only a taxpayer has standing to enforce compliance with the requirement that public contracts be awarded to the "lowest responsible bidder." *Lutz Appellate Printers v. Com. Dept. of Property & Supplies*, 472 Pa. 28, 33, 370 A.2d 1210, 1212 (1977); *R.S. Noonan, Inc. v. School Dist. of City of York*, 400 Pa. 391, 393, 162 A.2d 623, 625 (1960); *Conduit & Foundation Corp. v. City of Philadelphia*, 41 Pa.Commw.Ct. 641, 401 A.2d 376 (1979). The competitive bidding procedures are designed to protect the taxpayers from the wasteful or fraudulent expenditure of public funds, and create no rights in "disappointed bidders" who are not also taxpayers. *Lutz Appellate Printers, Inc. v. Com. Dept. of Property and Supplies*, 370 A.2d at 1212; *R.S. Noonan, Inc. v. School District of City of York*, 162 A.2d at 625. This standing requirement has been imposed in cases where the public agency has rejected all bids as well as in cases where the contract has been awarded to a firm other than the disappointed bidder. *See, e.g., Weber v. City of Philadelphia*, 437 Pa. 179, 181 n. 2, 262 A.2d 297, 299 n. 2 (1970). Regional concedes that it must establish taxpayer status but contends that it is a Philadelphia taxpayer by virtue of its obligation to pay business and mercantile taxes incurred in connection with work previously performed in Philadelphia from 1981–1983. Regional also contends that it is a Philadelphia taxpayer by virtue of its payment of Pennsylvania and federal taxes, which are said to benefit the City deratively "under revenue sharing concepts."

This Court has determined, solely for the purpose of this motion for a preliminary injunction, that the plaintiff does have .standing. However, the Court reserves the right to reconsider at a future date in this litigation the issue of Regional's standing. In any event, for the reasons set forth below, the Court has determined that Re-

gional has failed to show that it is entitled to a preliminary injunction.

As heretofore pointed out, this is a diversity action in which the parties agree with the Court that the law of Pennsylvania is applicable to the substantive issues in this case.

The public contract at issue in this case was subject to the competitive bidding requirements of Section 8–200(1) of The Philadelphia Home Rule Charter, which provides:

> Except in the purchase of unique articles or articles which for any other reason cannot be obtained in the open market, competitive bids shall be secured before any purchase, by contract or otherwise is made or before any contract is awarded for construction, alterations, repairs or maintenance or for rendering any services to the City other than professional services and the purchase shall be made from or the contract shall be awarded to the lowest possible bidder.

Section 8–200(2)(b) of the Home Rule Charter provides:

> (b) Bids shall publicly be opened and tabulated in the presence of a representative of the City Controller at the time specified for their opening. The Department may reject all bids if it shall deem it in the interest of the City so to do. Otherwise the contract shall be awarded to the lowest responsible bidder;

Under Pennsylvania law it is well-established that judicial review of an administrative determination to reject a bid is quite limited, and that "if a municipality, in connection with competitive bidding, is empowered to do so, it may reject any and all bids in the absence of fraud, collusion, bad faith, or arbitrary action." *Weber v. City of Philadelphia*, 262 A.2d at 297. In *Weber*, the City had solicited bids for the general concession contract for Veterans' Stadium. The City subsequently rejected all the bids submitted, citing several reasons which were challenged by the highest responsible bidder as arbitrary, capricious and contrary to the best interests of the City. The Pennsylvania Supreme Court de-

scribed the appropriate standard of review to be employed in such cases as follows:

> In this area of law, certain principles are well settled and stem, in large measure, from judicial respect for the doctrine of separation of powers in government. First, it is to be presumed that municipal officers properly act for the public good. Second, courts will not sit in review of municipal actions involving discretion, in the absence of proof of fraud, collusion, bad faith or arbitrary action equating an abuse of discretion. Third, on judicial review, courts, absent proof of fraud, collusion, bad faith or abuse of power, do not inquire into the *wisdom* of municipal actions and *judicial* discretion should not be substituted for *administrative* discretion. Fourth, if a municipality, in connection with competitive bidding, is empowered to do so it may reject any and all bids in the absence of fraud, collusion, bad faith or arbitrary action.

(Emphasis in original; citations omitted). 262 A.2d at 299. *See also Tri-County Motor Sales, Inc. v. Moore*, 52 Pa.Commw.Ct. 62, 65, 415 A.2d 439, 441 (1980); *Conduit & Foundation Corp. v. City of Philadelphia*, 401 A.2d at 380; *Nielson v. Womer*, 46 Pa.Commw.Ct. 283, 286, 406 A.2d 1169, 1171 (1979). After articulating the above-quoted standard of review, the *Weber* court concluded that none of the reasons offered by the City in support of its decision to rebid the concession contract was arbitrary or capricious. Although the *Weber* court did not distinguish between situations where a municipality rejects *some* bids and situations where a municipality rejects *all* bids, the Pennsylvania Supreme Court since has indicated that generally an administrative decision to reject *all* bids is to be accorded greater deference than an administrative decision to award a contract to a party other than the apparent lowest bidder. *See Lutz Appellate Printers v. Com. Dept. of Property and Supply*, 403 A.2d at 535; *see also Zurenda v. Commonwealth*, 46 Pa.Commwlth.Ct. 67, 70, 405 A.2d 1124, 1126 (1979).

Regional suggests that the recent decision in *Lasday v. Allegheny County*, 499 Pa. 434, 453 A.2d 949 (1982) has expanded the standard for judicial review of administrative decisions regarding contract awards to include a review of whether the administrative decision was "unfair" to the disappointed bidder. In *Lasday* the defendant county was not required to solicit competitive bids for the airport concession contracts at issue, but nevertheless undertook to solicit and receive proposals which conformed to certain announced requirements and to evaluate those proposals pursuant to a specified set of criteria. The plaintiff requested and was refused permission to submit a proposal which was not in accordance with the guidelines. Thereafter the plaintiff conformed his proposal to the County's specified guidelines and resubmitted it. The County then negotiated privately with another bidder and awarded to that bidder the same concession package which the plaintiff had originally proposed. The Court held that once the county had undertaken to proceed in a particular manner in connection with the award of the airport concessions it was obliged to conduct that *procedure* in accordance with "basic standards of fairness" and to adhere to that procedure throughout the procurement process. 453 A.2d at 954. Contrary to Regional's suggestion, the discussion of "fairness" in *Lasday* was directed to the county's failure to adhere to the bidding procedure which it advertised. *Lasday* does not in any way expand the review of administrative decisions to include a judicial determination as to whether a municipality's decision to reject bids is "unfair" to a disappointed bidder. Therefore, as stated in *Weber*, this Court's review of the City's decision to reject all the bids is limited to determining whether or not the City's decision was the product of "fraud, collusion, bad faith, or arbitrary action."

There is no evidence in this record of fraud, collusion, or bad faith. Regional has not claimed fraud, collusion, or bad faith. It bases its claim solely on the ground that the City's decision to reject all the bids was arbitrary and capricious in that the City refused to allow Regional to substitute a minority subcontractor in place of Accurate Fence.

This Court has concluded that the City's decision rejecting Regional's bid and rejecting all the bids was not arbitrary and capricious. The bid instructions clearly stated that the submission of a Schedule for Participation listing minority and female owned businesses was an element of responsiveness to the bid; that any firm listed in the Schedule for Participation must be certified prior to the award of the contract before it could be considered as meeting the requirements of Chapter 17–500; and that the listing of any firm was a commitment by the bidder that, if it was awarded the contract, it would enter into a subcontract with the firm for the portion of the work listed at the price set forth in the submission. Accurate Fence failed to complete the certification process, and thus rendered Regional's bid unresponsive to the City's bid specifications. The defect in Regional's bid was curable only if the City permitted Regional to substitute a minority subcontractor in lieu of Accurate Fence. The City, in accordance with its policy forbidding the pre-award substitution of MBE or WBE contractors, refused to allow Regional to amend its bid.

The City offered several reasons in support of the MBEC's policy prohibiting substitution. First, allowing substitution may encourage abuse by allowing unscrupulous bidders to list "front" minority subcontractors (e.g., subcontractors who are not in fact bona fide MBEs or WBEs) in an attempt to evade the requirements of Chapter 17–500. An unscrupulous bidder could list a "front" subcontractor and, if the "front" was subsequently rejected by the MBEC, the bidder could remain in the bid competition without penalty simply by substituting a certifiable subcontractor. Although in this case it is clear that Regional has not attempted to evade the requirements of Chapter 17–500, the City's decision to strictly enforce its "no substitution" policy in every case is not arbitrary or capricious.

Another reason stated by the City in support of its policy is to avoid the appearance of unfairness which might arise if a low bidder were allowed to "negotiate", through substitution, on an element of responsiveness to the bid, and consequently a second low bidder who included certified or certifiable firms in his or her bid package might believe that the MBE program was not being applied fairly if the low bidder were allowed to replace uncertified firms with certified firms prior to the award. On the other hand, this Court does not hesitate to point out that the City's policy forbidding the substitution of a certified MBE subcontractor for one not certified has in this case caused unnecessary delay in awarding the contract, and may result in additional cost for the project.

▮▮▮ It is not the function of this Court, however, to substitute its judgment as to whether the City should or should not permit substitution of subcontractors in cases such as this. Whether the City's policy against substitution is a wise policy, or even a desirable policy, is not for this Court to decide. As the court in *Weber* stated, "Whether the City was wise in its rejection of the bids is not within our province to determine." 262 A.2d at 302. In applying the arbitrary and capricious standard to agency determinations, it is well-settled that a court must often affirm administrative decisions with which it disagrees. *Ethyl Corp. v. Environmental Protection Agency,* 176 U.S.App.D.C. 373, 408, 541 F.2d 1, 36, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

In addition to challenging the City's policy forbidding substitution of subcontracts, Regional contends that there was an "ambiguity" in the bid instructions which would justify permitting Regional to amend its bid. The instructions in the "MBEC Program" section of the bid package state that the listing of MBE and WBE firms in the Schedule of Participation "is a commitment by the bidder that, if it is awarded the contract, it will enter into a subcontract with the firm for the portion of the work listed at the price set forth in this bid submission." This instruction is said to conflict with the direction in the "Special Contract Requirements" section of the bid package to "employ no subcontractors" without the written approval of the Director of the Architecture and Engineering Division.

▮▮▮ The Court agrees that the bid instructions in this case are not a model of clarity. The Court recognizes that the MBEC program, at the time these bid instructions were drafted, was a "start-up" program necessitating changes in the bid instructions for City contracts. However, any ambiguities present in these instructions do not render the City's refusal to allow Regional to substitute a minority subcontractor arbitrary or capricious. Regional was well aware at the time it submitted its bid that it was required to list certified or certifiable firms in its Schedule for Participation. Accurate Fence refused to complete the certification process. Moreover, if as Regional contends there was a "significant ambiguity" in the bid instructions, the ambiguity would apply to all the bidders, and it would be well within the City's discretion to reject all the bids, clarify the ambiguity, and readvertise the contract. *See, e.g., Ogden Foods, Inc. v. State Farm Products Show,* 11 Pa. Commwlth. 435, 440, 315 A.2d 329, 332 (1974) (not arbitrary or capricious for state agency to reject all bids and readvertise where original bid instructions were unclear).

For all of the reasons heretofore set forth, the Court has concluded that the City did not act arbitrarily or capriciously in refusing to allow Regional to substitute a minority subcontractor in place of Accurate Fence and in rejecting all of the bids. Therefore the Court has determined that Regional has not carried its burden of showing a reasonable likelihood of success on the merits in this litigation.

▮▮▮ Furthermore, the moving party seeking an injunction must always demonstrate that irreparable injury will occur unless relief maintaining the status quo is granted. *Moteles v. University of Penn-*

*sylvania, et al.,* 730 F.2d 913, 918 (3d Cir. 1984), citing *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351 (3d Cir.1980). Regional has failed to show that it will suffer irreparable injury pendente lite if the injunction is not issued. In its original motion for a preliminary injunction Regional contended that it would suffer irreparable harm if the contract was awarded to another bidder pending the outcome of this litigation. Regional appeared to be unaware of the City's decision to reject *all* the bids at the time it filed its motion for a preliminary injunction. In fact, Regional's president testified at the hearing that he had not been made aware of the City's decision to reject all the bids until the morning of the hearing.

The City's decision to reject all the bids and readvertise the project gives Regional another opportunity to submit a responsive bid. Although it is possible that Regional would not participate in the rebidding, or might not submit the lowest bid in the ensuing bid competition, the mere possibility of future injury is not sufficient to satisfy the standard for granting a preliminary injunction. The Third Circuit has held that a district court should not "exercise the delicate power of injunctive relief" absent a "clear showing of immediate irreparable injury." *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir.1976). The movant for injunctive relief must show "a presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights ..." *Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d at 359, quoting *Holiday Inns of America, Inc. v. B & B Corporation,* 409 F.2d 614, 618 (3d Cir.1969). It is interesting to note that in *Cubic Western Data v. New Jersey Turnpike Authority,* 468 F.Supp. 59, 71 (D.N.J.1978), the court held that no immediate irreparable injury will be suffered by a disappointed bidder where all bids are rejected and the contract readvertised. This Court has concluded that Regional has failed to carry its burden of demonstrating that it will suffer immediate irreparable harm if the City is permitted to readvertise the contract.

The Court also has considered the possibility of harm to other interested parties resulting from the grant or denial of the requested injunction. There is nothing in this record which in any way indicates that other interested parties will be harmed by this Court's refusal to grant the requested injunction.

Finally, the Court has also considered the interest of the public in the grant or denial of the injunction. As heretofore pointed out, readvertising the contract will further delay the completion of the project, and might entail additional cost. On the other hand, however, the City's policy refusing substitution of certified MBE and WBE subcontractors may, in the long run, better achieve the laudatory objectives of the MBEC program requiring minority and female participation in public contract work. This Court has determined that the issuance of the requested injunction would create an additional and unnecessary delay in the completion of the project.

For the reasons heretofore set forth, this Court has determined that Regional has failed to show either a reasonable probability of eventual success in this litigation or a threat of immediate irreparable injury pendente lite if the injunction is not issued. The Court also has considered the potential harm to interested third parties resulting from the grant or denial of the injunction, as well as the effect of the grant or denial of the injunction upon the public interest, and has determined that these factors do not militate against the denial of the injunction. For all of these reasons, Regional's motion for a preliminary injunction will be denied.