**DELAWARE RIVER PORT
AUTHORITY et al.**

**v.**

**TRANSAMERICAN TRAILER TRANS-
PORT, INC., Appellant.**

**No. 74–1214.**

United States Court of Appeals,
Third Circuit.

Argued May 28, 1974.

Decided July 30, 1974.

---

John G. Harkins, Jr., Marjorie G. Marinoff, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Amy Scupi, Olga Boikess, Galland, Kharasch, Calkins & Brown, Washington, D. C., for appellant.

Abraham E. Freedman, Freedman, Borowsky & Lorry, Philadelphia, Pa., for ILA, Phila. District Council.

Martin A. Heckscher, Duane, Morris & Heckscher, Philadelphia, Pa., for Delaware River Port Authority.

Israel Packel, Harrisburg, Pa., Gordon P. MacDougall, Washington, D. C., for Commonwealth of Pennsylvania.

Francis A. Scanlan, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for Phila. Marine Trade Assn. and Port of Phila. Marine Terminal Assn.

M. Carton Dittmann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Phila. Port Corp. and Greater Phila. Chamber of Commerce.

Martin Weinberg, Herbert Smolen, Philadelphia, Pa., for City of Philadelphia.

James L. Pimper, Gen. Counsel, Douglas N. Jones, Atty., Federal Maritime Commission, Francis B. Burch, Atty. Gen., of Maryland, Eldred N. Bell, Jr., Baltimore, Md., Director of Transp. for Maryland Port Administration, for amicus curiae.

## OPINION OF THE COURT

Before ROSENN and HUNTER, Circuit Judges, and HANNUM,* District Judge.

ROSENN, Circuit Judge.

This appeal involves a novel issue of considerable importance to the shipping industry and to American maritime ports. The plaintiffs are parties interested in the promotion of the shipping industry in the Port of Philadelphia. The defendant, Transamerican Trailer Transport, Inc. (TTT), is a steamship company and common carrier by water.[1] TTT ships do not call at the Port of Philadelphia, but TTT maintains steamship service between New York and San Juan, Puerto Rico, and between Balti-more and San Juan. The plaintiffs contended before the district court that solicitation of cargo by TTT illegally encourages certain shippers of Puerto Rico-bound containerized cargo to ship their cargo from the TTT port facilities in New York or Baltimore, rather than from another carrier's Philadelphia port facilities.

The district court, in an action not contested on this appeal, held that the merits of the contention by the plaintiffs should first be considered by the Federal Maritime Commission (FMC) under the doctrine of primary jurisdiction. In addition, however, the district court entered a preliminary injunction prohibiting TTT from the "solicitation of cargo" which is "naturally tributary to the Port of Philadelphia"[2] and which is destined for Puerto Rico, pending ultimate resolution of the controversy by the FMC and the appellate courts.[3]

TTT appeals from the grant of the preliminary injunction.[4] The FMC and the Maryland Port Administration, as amicus curiae, have filed briefs supporting reversal of the injunction. For the reasons expressed below, we reverse.

Underlying our consideration of the issues is the proposition that,

[A]s a prerequisite to the issuance of a preliminary injunction the moving party must generally show: (1) a

---

* Judge Hannum was present at oral argument but did not participate in the decision of this case.

1. 46 U.S.C. § 801.

2. Cargo is "naturally tributary" to a port when, "because of a combination of geographic, commercial, and economic considerations," the port "would naturally serve such cargo." Intermodal Service to Portland, Oregon, 17 F.M.C. ——, 14 P & F Shipping Reg. 107, 125 (1973).

3. The pertinent provision of the preliminary injunction order, issued February 4, 1974, stated:

    Defendant, their agents, employees, officers, directors, and any person in active concert or participation with them who receive actual notice of this Court's Order, are hereby restrained, pending a final decision by the Federal Maritime Commis-sion or by any Appellate Court which review that decision from solicitation of cargo.

    In a separate opinion dated February 21, 1974, the court referred to the February 4 order as "an order enjoining the defendant from solicitation of cargo in the Philadelphia Port Area destined for Puerto Rico." The court also stated that in framing the order it "deemed it advisable to target the area involved as that which is naturally tributary to the Port of Philadelphia."

    As do all the parties before us, we will interpret the February 4 order in the manner expressed by the district court's opinion of February 21.

4. In light of our disposition of this appeal, we do not reach TTT's appeal from the district court's order of February 21, 1974, setting bond of $10,000 to be posted by plaintiffs.

reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo.

A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971). Moreover, this court has repeatedly stated that the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.[5] It is also clear, however, that consideration of these factors by the district court requires a "delicate balancing," and that the district court's grant or denial of a preliminary injunction will be reversed only for an abuse of discretion. *See, e. g.*, Scooper Dooper, Inc. v. Kraftco Corp., 460 F.2d 1204 (3d Cir. 1972), and cases cited therein. We must determine, therefore, whether the grant of a preliminary injunction in this case was an abuse of discretion.

We first consider whether the plaintiffs have shown "a reasonable probability of eventual success in the litigation." The district court found, without further discussion of this issue, that the plaintiffs were "likely to prevail" before the FMC. Our consideration of this issue requires a review of the factual background of the case and of the legal theory upon which the plaintiffs rely.

The findings of fact made by the district court included the following:

7. The Holt Hauling and Warehousing Company, (Holt) maintaining its principal office in Philadelphia, Pennsylvania is the agent of TTT in approximately a five state territory from Pittsburgh, Pennsylvania to as far south as Washington, D. C. and as far east as the Atlantic seaboard.

8. As the agent for TTT, acting through its sales force and advertising, Holt solicited shipping business in the aforesaid territorial limits.

9. The purpose of said solicitation is to have shippers move their shipment by over-the-land motor carriers to the port of New York or Baltimore and there to be loaded upon the ocean carriers of the defendant. The ultimate destination for the loads to be delivered is San Juan, Puerto Rico.

10. As a result of the combined advertising and sales program carried on by TTT and Holt between thirty (30) and one hundred (100) truckloads of ocean freight [per week] is transported from various inland points to New York or Baltimore.

11. In the ordinary course of business a substantial part of the shipments bound for Puerto Rico would be carried via the Port of Philadelphia.

6. TTT does not pay any part of the inland transportation charge for cargo coming to its vessels from the Philadelphia Port area said charges being paid entirely by the shipper, according to tariffs on file with the Interstate Commerce Commission.

The specific practices by TTT of which the plaintiffs complain is not entirely clear from the record.[6] It appears however, that at issue are the employ-

---

5. *See, e. g.*, Commonwealth of Pennsylvania ex rel. Creamer v. United States Dep't of Agriculture, 469 F.2d 1387, 1388 (3d Cir. 1972) ; In re Penn Central Transportation Co., 457 F.2d 381, 384–385 (3d Cir. 1972) ; Nelson v. Miller, 373 F.2d 474, 477 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). *See also* Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C.Cir. 1958).

6. The plaintiffs' complaint in the district court states that,

[b]y soliciting and encouraging shippers located in the Port of Philadelphia area to move their cargo through other ports of exist or entry, defendant has in the past and is continuing in the present to divert cargo illegally from the Port of Philadelphia, as is more fully set forth in Exhibit "A" to this Complaint, which is a Complaint against these practices filed by plaintiffs with the Federal Maritime Commission.

The complaint filed with the FMC, however, simply repeats the substantive provi-

ment by TTT and Holt of sales and marketing personnel in the Philadelphia area, TTT advertising in the Philadelphia area concerning the availability of its service from New York and Baltimore, and the relationship between TTT and Holt pursuant to which Holt solicits business for TTT in the Philadelphia area and also trucks the cargo to TTT's port facilities in New York and Baltimore.[7]

■ The plaintiffs contend that these practices are illegal under the Shipping Act of 1916, 46 U.S.C. § 801 *et seq.*, and the Merchant Marine Act of 1920, 46 U.S.C. § 861 *et seq.* In their complaint presently pending before the FMC, they point to three statutory provisions allegedly violated by TTT. First, they cite section 16 of the Shipping Act, 46 U.S.C. § 815, which makes it unlawful for a common carrier by water to "subject any particular . . . locality . . . to any undue or unreasonable preju-

dice or disadvantage in any respect whatsoever."[8] Second, they point to section 17 of the Shipping Act, 46 U.S.C. § 816, which prohibits carriers by water in foreign commerce from "demand[ing], charg[ing] or collect[ing] any rate, fare, or charge which is unjustly discriminatory between . . . ports . . . ."[9]

Finally, they rely upon section 8 of the Merchant Marine Act, 46 U.S.C. § 867, which imposes upon the Secretary of Commerce the duty, *inter alia*, "to investigate any . . . matter that may tend to promote and encourage the use by vessels of ports adequate to care for the freight which would naturally pass through such ports."[10]

In support of their contention that the TTT practices are detrimental, discriminatory and unduly prejudicial to the Port of Philadelphia and to businesses dependent upon that port, plaintiffs rely primarily upon several decisions of the

---

sion of the above-quoted district court complaint, and does not specifically set forth the practices which plaintiffs allege are illegal.

7. The trucking is actually done by Holt Motor Express, Inc., an affiliate of Holt Hauling and Warehouse Systems, Inc. (referred to in Finding 7 of the district court as Holt Hauling and Warehousing Company). For convenience we will refer to both companies as Holt.

8. 46 U.S.C. § 815 provides in relevant part:
It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—
First: To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

9. 46 U.S.C. § 816 provides in relevant part:
No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors.

This provision is inapplicable on its face because the East Coast-Puerto Rican sea route is not within foreign commerce within the meaning of the statute. *See* 46 U.S.C. § 801. It appears, however, that the FMC applies the same substantive standards to sections 815 and 816.

10. 46 U.S.C. § 867 imposes upon the Secretary of Commerce, *in cooperation with the Secretary of the Army*, "with the object of promoting, encouraging, and developing ports and transportation facilities in connection with water commerce over which he has jurisdiction," to investigate numerous matters, including that quoted in the text, as well as "to investigate territorial regions and zones tributary to such ports, taking into consideration the economics of transportation by rail, water, and highway and the natural direction of the flow of commerce . . . ."
While this provision does not proscribe any particular conduct, the FMC takes into account, in enforcing the Shipping Act, the policies in this section favoring port improvement and development. *See* Port of New York Authority v. FMC, 429 F.2d 663, 670 (5th Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971); Pacific Far East Line v. United States, 101 U.S.App.D.C. 24, 246 F.2d 711, 716 (D.C. Cir. 1957); Intermodal Service to Portland, Oregon, *supra,* 17 F.M.C. at ——, 14 P & F Shipping Reg. at 132.

FMC, particularly Intermodal Service to Portland, Oregon, 17 F.M.C. ——, 14 P & F Shipping Reg. 107 (1973).[11] Plaintiffs conclude that "a water carrier which does not bring its ships into the Port of Philadelphia may [not] send salesmen into the Philadelphia area and solicit cargo business which is naturally tributary to Philadelphia, and then move it overland to the Port of New York or Baltimore, and there load it aboard its vessel."

The cases relied upon by the plaintiffs, however, do not strongly support their position. Each differs from the instant case in one respect. In each case, the practice held to violate the Shipping Act involved absorption by a water carrier of shippers' overland transportation costs. The FMC, summarizing the principle for which these cases stand, recently stated:

> Port equalization means the allowance or absorption by the ocean carrier of such amount as will make the shipper's cost of overland transportation identical, or substantially so, from his inland point of origin to any one of two or more ports. Its purpose is to enable the ocean carrier to compete for cargo without calling at the port closest to, or enjoying the lowest inland transportation costs from, the point where the cargo originates.

The most recent decisions of the Commission hold that port equalization violates section 16 of the [Shipping] Act where it (1) diverts traffic from a port to which the area of origin is naturally tributary, to a port in which the area is not naturally tributary, and (2) is not justified, in the shipper's interest, by lack of adequate service out of the port from which traffic is so diverted.

Sea-Land Services, Inc. v. South Atlantic & Caribbean Line, Inc., 9 F.M.C. 338, 344 (1966).

There is no contention in this case that TTT absorbs the inland freight charges of the shippers and thus engages in port equalization. As noted above, the district court expressly found to the contrary in its sixth finding of fact. The challenged practices are simply the use of salesmen and advertising to point out to Philadelphia-area shippers the advantages of paying extra overland transportation costs to ship their Puerto Rico-bound cargo out of New York or Baltimore. Possible advantages to Philadelphia area shippers from such an arrangement would include faster or more efficient service.[12] We are aware of no case which has intimated that these advertising practices are in any way illegal absent the additional practice of port equalization.[13]

11. Particular reliance is also placed upon Pacific Far East Line v. United States, 246 F. 2d 711 (D.C.Cir. 1957); Delaware River Port Authority v. United States Lines, Inc., 331 F.Supp. 441 (E.D.Pa.1971); Sea-Land Services, Inc. v. South Atlantic & Caribbean Line, Inc., 9 F.M.C. 338 (1966); Port Commission of City of Beaumont, Texas v. Seatrain Lines, Inc., 2 U.S.M.C. 500 (1941).

12. The record indicates that TTT's service to Puerto Rico is twice weekly out of New York and once weekly out of Baltimore. The only service out of Philadelphia is a weekly feeder vessel by a different carrier taking cargo bound for numerous locations (including Puerto Rico) to the carrier's port facilities in Elizabeth, New Jersey.

13. *Intermodal Service to Portland, Oregon, supra,* is not to the contrary. In that case, the FMC was called upon to determine the legality of a practice by a conference of wa-

ter carriers in discharging cargo at Seattle and absorbing the overland transportation costs to Portland. Certain local cargo was naturally tributary to Portland, while other cargo destined for inland areas was not naturally tributary to any port. The FMC upheld the cost absorption practice, with the condition that "each line serving Portland by means of an indirect overland service serve that port by direct water service, with the frequency of at least alternate sailings." 14 P & F Shipping Reg. at 128.

There is no indication in the opinion that a carrier which did not absorb inland transportation costs would be prohibited from discharging Portland-bound cargo at Seattle. The Commission noted, for example, that its condition was adequate to implement the policy of section 8 of the Merchant Marine Act, *supra*, because the condition "will prevent carriers not calling at Portland by water from absorbing *any* inland transportation

■■ Moreover, the General Counsel to the FMC, in his brief as *amicus curiae* supporting reversal of the preliminary injunction, refers to plaintiffs' action as "a novel cause of action," and states that the merits of the action "are best characterized by doubt rather than certainty." The brief states further:

> As previously stated, *the FMC has never found mere cargo solicitation to violate the Shipping Act*. The Port Authority complaint is a case of first impression necessarily requesting an extension of prior FMC rulings on port discrimination and diversion. Although Appellees have implied that the solicitation of cargo in an area not directly served by a carrier is a per se violation of the Shipping Act, this is not the law. Every prior FMC decision, including [*Intermodal Service to Portland, Oregon, supra*] dealing with indirect service practices has involved the absorption of land transportation costs by the carrier.

> \*    \*    \*    \*    \*    \*

> Because [the case] presents unprecedented and difficult questions of law, there is no clear likelihood or assurance that the Port Authority interests will prevail on the merits. (citations omitted). Without meaning to prejudge the ultimate result in any way, the FMC submits that there is no basis for concluding that [the case] will be decided in Appellees' favor. Such a result is possible, but not reasonably certain. (citation omitted) (emphasis supplied).

Since this case will be heard on the merits in the first instance by the FMC, and since the plaintiffs rely heavily upon FMC case law, we believe that considerable deference should be given to the FMC's estimate, if any, of the likelihood that plaintiffs will succeed on the merits.[14]

These considerations standing alone would impel us to reverse the grant of the preliminary injunction. As we have noted, however, several other factors must be weighed by the trial court in determining whether a requested preliminary injunction should be granted. These factors are the possibility of irreparable injury to the moving party and to other persons, and the public interest. If these remaining factors, on balance, strongly favored the grant of a preliminary injunction, the trial court's grant of the injunction may not be an abuse of discretion even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required. *See* Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687, 692–93 (2d Cir. 1973).

■■ We do not believe, however, that the other factors are sufficiently compelling in this case to justify the grant of the preliminary injunction, absent a more convincing showing by plaintiffs of their likelihood of ultimate success in the litigation. We recognize that the district court found that the plaintiffs and the Philadelphia port area would suffer "extensive irreparable harm" if the defendant's conduct were ultimately declared illegal, and that "[i]n comparison, the defendant's injury would be minimal" if its conduct were ultimately declared legal. Even assuming the district court was correct in

---

costs and insure a level of water service by those calling there sufficient, so far as the record here appears, to handle local Portland cargoes." *Id.* at 132.

14. The FMC was unaware of the proceedings in the district court and thus had no opportunity to make its views known at that time. Under these circumstances, and because the FMC does not raise any contentions concerning factual determinations, we will consider the FMC position even though it was not before the district court. We believe that in the future, however, a district court deferring to an administrative agency under the doctrine of primary jurisdiction should actively solicit the views of the agency before issuing a preliminary injunction pending decision of the case by the agency. The agency's position is not, of course, binding on the district court.

these conclusions, however,[15] we believe that the court failed to take into account other factors which considerably reduce the weight to be given these conclusions.

First, the district court did not take into account the interests of third persons. It did not consider the interests of the Philadelphia shippers who prefer to utilize TTT's service. Even more significantly, the district court failed to weigh the interests of the ports of New York and Baltimore. The instant case is essentially an attempt by Philadelphia Port interests to regain business which has been diverted to the ports of New York and Baltimore by allegedly illegal means. It is apparent that to the extent the Philadelphia area *avoids* injury by the grant of a preliminary injunction against TTT, the New York and Baltimore port areas *suffer* injury by the grant of the injunction. Plaintiffs produced no evidence to the contrary.

> Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents.

Virginia Petroleum Jobbers Ass'n v. F P C, 259 F.2d 921, 925 (D.C.Cir. 1958). We believe that when considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other and greater significance must be placed upon the likelihood that each party will ultimately succeed on the merits of the litigation. We do not believe, therefore, that the district court's finding of irreparable injury to the plaintiffs is sufficient to outweigh the plaintiffs' rather weak showing concerning their likelihood of success on the merits.

In addition, the district court did not expressly take into account the public interest. We believe that weight must be given to the FMC's views on this matter.[16] The FMC *amicus* brief states that "the instant injunction seriously encroaches upon the FMC's statutory responsibility to establish and maintain uniform maritime practices and policies . . . ." It points out that "[c]argo solicitation agents are a customary marketing device in the shipping industry," and that TTT's arrangement with Holt was consistent with industry practice. The FMC apparently believes that these present industry-wide solicitation practices should be permitted to continue unless and until it determines that they are illegal; if found illegal, the practices will then be proscribed on an industry-wide basis.

We are not indifferent to the admirable zeal and public spirit which motivates the plaintiffs' efforts to promote the Port of Philadelphia as a shipping center. We cannot, however, look at the facts and issues presented in this case in a provincial manner. We believe that the general public interest, as well as the other considerations discussed above, require us to hold that the district court abused its discretion in granting the preliminary injunction.[17] We note that if TTT's solicitation practices are ultimately declared to violate the Shipping Act, the plaintiffs can bring an action for damages against TTT pursuant to section 22 of the Act, 46 U.S.C. § 821.

The judgment of the district court granting the preliminary injunction will be reversed.

---

15. Plaintiffs' witness testified on direct examination that the economic impact on the Philadelphia area from the challenged TTT practices totaled two to three million dollars annually, and that his experience indicated that the FMC would take at least two years to hand down its decision.

16. As previously noted, these views should preferably be taken into account by the district court in the first instance. *See* note 14 *supra.*

17. In light of this disposition, we need not consider TTT's contentions that the injunction is invalid because it lacks precision in defining the area "naturally tributary" to the Port of Philadelphia, or that the injunction cannot be said to maintain the status quo when it prohibits a practice which has been in effect for several years.