614 F.2d 351
 The CONTINENTAL GROUP, INC., a corporation, Appellant in No. 79-1780
v.
AMOCO CHEMICALS CORP., a corporation, and Eugene F. Grovijohn.
Appeal of AMOCO CONTAINER COMPANY and Eugene F. Grovijohn.
 Nos. 79-1780, 79-1781.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 11, 1979.
Decided Jan. 31, 1980.
 
 John J. Francis, Jr., Shanley & Fisher, Newark, N. J., for Amoco Container Co., appellant in 79-1781 and as cross-appellee in 79-1780.
 Philip D. Pakula, Townley & Updike, New York City, of counsel, for Eugene F. Grovijohn, appellant in 79-1781 and as cross-appellee in 79-1780; Goodman, Stoldt & Horan, Hackensack, N. J., attys., for Eugene F. Grovijohn.
 Michael R. Griffinger, John H. Klock, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for Continental Group, Inc., appellee in 79-1781 and as cross-appellant in 79-1780.
 Before ADAMS, ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 In this diversity action,[1] The Continental Group (Continental) sued Amoco Container Company (Amoco) and Eugene Grovijohn to enforce nondisclosure and noncompetition covenants entered into by Continental and Grovijohn. Injunctive relief as well as damages were sought. From an order granting Continental a preliminary injunction as to one covenant, Amoco and Grovijohn appeal. Continental cross-appeals from the denial of a preliminary injunction as to a separate but related covenant. Both appeals are properly before this Court under 28 U.S.C. § 1292(a)(1), and each presents the question whether the requisites for granting preliminary relief were properly met.
 
 I.
 
 2
 Following graduation from college with a degree in business administration, Eugene Grovijohn worked ten years for Continental. He held production supervision and lower level management jobs, but was never employed as an engineer or technician. For the first eight years with Continental, Grovijohn worked in the metal products division. Dissatisfied with the lack of opportunity for advancement in that area, he sought a transfer to the more dynamic plastic beverage bottle division. This latter division was to produce the polyethylene terephthalate ("PET") bottle, a large plastic bottle of 1 or 2 liter size that is in high demand because it is lighter and less breakable than glass bottles.
 
 
 3
 Before transferring, Grovijohn was required to sign three restrictive covenants, the enforcement of which spawned this dispute. The first was an "Intra-Company Secrecy Covenant" wherein Grovijohn agreed not to disclose confidential information obtained in the plastic beverage bottle division to other personnel in Continental. In the second covenant, Grovijohn agreed not to disclose, "directly or indirectly," "or use outside of the Continental organization during or after (his) employment, any confidential information" without Continental's consent.[2] The third was a noncompetition agreement, by which Grovijohn obligated himself for a period of eighteen months after termination of employment with Continental not to "directly or indirectly, for (his) own account or as an employee of another, engage in any competitive enterprise as hereinafter defined. The term 'competitive enterprise' as used herein shall include the development, manufacture, distribution or sale of plastic injection blow molding molds, tools, and machinery and services incidental thereto" in the United States and certain other specified countries.
 
 
 4
 After the covenants were signed, apparently in New York,[3] Grovijohn was sent to Continental's research facility in Merrimack, New Hampshire, where he was given instruction regarding the machine used by both Continental and Amoco, the RHB-V.[4] Fifteen months later, he was assigned to the Hartford, Connecticut, plant, which was apparently the first full-production facility for manufacturing Continental's PET bottle. Although not an engineer, Grovijohn was placed in the Engineering Department, and appears to have been involved primarily in writing and standardizing preventive maintenance manuals and procedures as well as process bulletins. He inspected various other Continental plants, and it is alleged that he became familiar with all stages of production of PET bottles. From Hartford, Grovijohn went to Kentwood, Michigan, to assume the position of superintendent of a plant manufacturing PET bottles.[5]
 
 
 5
 In September 1978, Grovijohn, having become dissatisfied with the transfers and seeming lack of opportunity for advancement in Continental to upper-level management jobs,[6] sent his resume to the Fortune Agency, a personnel search firm. That agency in turn ascertained that Amoco had openings for plant managers and was looking for people with management backgrounds, preferably having familiarity with plastic injection or blow molding.
 
 
 6
 It soon was decided that Grovijohn would become manager of Amoco's Seymour, Indiana, plant, which produces PET bottles with RHB-V machines. Amoco, informed of the protective covenants entered into by Grovijohn, agreed to pay the cost of defending him against any lawsuit brought by Continental, provided Amoco could choose legal counsel. Additionally, if any injunction were issued prohibiting Grovijohn from acting as plant manager, Amoco agreed to place him in a position which would not violate the injunction for a period not to exceed one year or, at Amoco's option, to pay the difference between the time worked to that date and one year's salary.
 
 
 7
 Continental immediately filed a complaint in the District Court of New Jersey seeking to enjoin Grovijohn from disclosing any of Continental's confidential information received while in its employ, to prevent him from breaching the covenant of noncompetition, to enjoin Amoco from employing Grovijohn, and to prohibit Amoco from engaging in unfair competition (a charge of "raiding").
 
 II.
 
 8
 A hearing was scheduled on the motion for a preliminary injunction for March 28, 1979. Upon learning that Grovijohn was to begin work at the Indiana plant on March 20, Continental sought and was granted a hearing for a temporary restraining order on March 20, at which time the court entered an order restraining Grovijohn from rendering any services as an employee of Amoco and from disclosing any confidential information. The district judge also scheduled a hearing on the preliminary injunction for approximately a week later, appointed his own independent expert, and directed the parties to allow the expert to inspect their plants and to submit in sealed boxes their processes so that the expert could compare and ascertain whether Continental knew anything about injection blow molding that Amoco did not know.
 
 
 9
 The injection blow molding process to which the contract refers comprises two steps: the plastic is first shaped by injection into a preform, which is quickly cooled to prevent crystallization, and the preform is later reheated to be blown into the actual bottle. The RHB-V executes only the second step. Because the RHB-V is part of the process of injection blow molding, the trial judge found that its operation came within the coverage of the noncompetition covenant. Accord Continental Group, Inc. v. Kinsley, 422 F.Supp. 838, 841 (D.Conn.1976) (construing identical terms).
 
 
 10
 Holding, nevertheless, that the activity to be engaged in by Grovijohn was not covered by the covenant, the district judge concluded that Grovijohn could not be preliminarily enjoined from working as Amoco's plant manager. He declared:
 
 
 11
 Amoco's principal activity is bottle production, not machine design. To the extent that Amoco or affiliated companies do now or may hereafter engage in the development, manufacture, distribution or sale (in the disjunctive) of molds, tools and machinery and incidental services connected with the process of injection/stretch/blow molding of plastic, then the covenant bars Grovijohn from engaging in that activity, but does not otherwise bar him from managing a plant to manufacture PET bottles.
 
 
 12
 The court sees no reason why Grovijohn may not undertake his duties as plant manager of the Seymour, Indiana plant of Amoco so long as his functions and activity have nothing to do with what is within the scope of the covenant.
 
 
 13
 Although Grovijohn's employment in the plant of a competitor manufacturing PET bottles was not considered by the district judge to constitute by itself a breach of the noncompetition covenant, such employment was found to pose a risk that confidential information might be inadvertently disclosed. Grovijohn was therefore prohibited from disclosing or using a wide variety of information gained in Continental's employ and alleged to be confidential.[7] Additionally, Amoco was preliminarily prohibited from using Grovijohn in any position that would violate his agreement with Continental and from using or disclosing any information that he had been enjoined from disclosing.[8]
 
 
 14
 Both sides maintain that the district court's order is inconsistent. Amoco appeals from the order prohibiting disclosure of information on the ground, inter alia, that it cannot be reconciled with the finding that Grovijohn's employment as a plant manager poses no danger. Continental moved to broaden the preliminary injunction to forbid Grovijohn from working at the Indiana plant on the basis that if the court believes that a danger of disclosure, intentional or not, exists, Grovijohn should not be permitted to continue in a position in which the likelihood of disclosure is increased. In appealing the district court's denial of a preliminary injunction against Grovijohn's employment at Amoco's Indiana plant, Continental argues that in order to perform his job to the best of his ability, Grovijohn will be under almost irresistible pressure to use or to convey confidential knowledge previously obtained from Continental.
 
 III.
 
 15
 In challenging the preliminary injunction that forbids Grovijohn's disclosure or use of any information in a large number of areas acquired while in Continental's employ, and prohibits Amoco's use of any such information inadvertently disclosed, Amoco asserts the following claims: (1) The district court erred as a matter of law in preliminarily enjoining acts that were neither threatened, intended nor likely; (2) the preliminary injunction is not specific enough to meet the requirements of Fed.R.Civ.P. 65(d); (3) the injunction is overly broad; and (4) there was insufficient proof that the information subject to the injunction would properly be considered trade secrets to support a conclusion that Continental would be likely to succeed on the merits of this claim.
 
 
 16
 To support a preliminary injunction, the moving party must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made[9] and that there is a reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the nonmoving party as well as to any other interested persons and, when relevant, harm to the public. Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974).[10]
 
 
 17
 Because the grant or denial of a preliminary injunction is based on a limited hearing that frequently produces an abbreviated set of facts and involves a "delicate balancing" of all the elements mentioned above, the scope of appellate review of the trial court's decision is necessarily narrow. "Unless the trial court abuses (its) discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct." A. O. Smith Corporation v. FTC, 530 F.2d 515, 525 (3d Cir. 1976).[11]
 
 
 18
 The factual basis on which the district court granted preliminary injunctions against Grovijohn and Amoco is somewhat puzzling, though not without appeal. Irreparable harm to Continental was said to be "the risk . . . of an inadvertent disclosure or use" of its proprietary information. The judge acknowledged that "Grovijohn says he has no intention of making any disclosure or use of (proprietary) information in his new job, and . . . Amoco says it has no interest in or desire for it." He noted, nevertheless, that an inadvertent disclosure if it occurred would do as much harm to Continental as would an intentional one, and the risk of the former is "just as great, objectively, as" is risk of the latter. But the degree of risk was not assessed by the district court as to either intentional or inadvertent disclosure. Rather, the trial court merely concluded that "(t)he risk is undeniably there and needs protection until final decision because the damage that would ensue from disclosure or use . . . cannot be measured in money." The district court concluded:
 
 
 19
 Continental has adequately shown a substantial likelihood of eventual success on the merits, and that the damage in the absence of a preliminary injunction would be irreparable. The balance of equities is clearly in Continental's favor in view of the representation that neither Amoco nor Grovijohn intend to disclose or use the information. The public interest warrants protection against the loss of Continental's property and against the threat of unfair competition.
 
 
 20
 But the public interest assigned by the trial judge in support of the preliminary injunction was not sufficiently specific. Rather, the public interest was expressed only in general and abstract terms. Although it is axiomatic that our laws protect private property and set standards for business competition and that obedience to such laws is in the public interest, these broad principles have no relevance as a separate factor in determining whether an interlocutory order is appropriate. If the interest in the enforcement of contractual obligations were the equivalent of the public interest factor in deciding whether or not to grant a preliminary injunction, it would be no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits.
 
 
 21
 The public interest element considered in previous cases has been much more concrete and specific. Thus, in Delaware River Port Authority, the public interest factor considered in reversing a preliminary injunction was the declaration by the Federal Maritime Commission in a brief submitted as amicus curiae that the interlocutory injunction would encroach upon the agency's statutory responsibility to regulate maritime practices and policies. 501 F.2d at 924.
 
 
 22
 In United States v. Spectro Foods Corporation, 544 F.2d 1175, 1181 (3d Cir. 1976), this Court criticized the trial judge for making no specific findings of injury "other than that resulting from defendants' violation of the Act itself." The detriment to the public interest considered in Oburn v. Shapp, 521 F.2d 142, 152 (3d Cir. 1975), was that the requested interlocutory order would interdict the training of police cadets, and thereby raise the possibility of substantial harm to the public through police understaffing. Finally, in Constructors Association of Western Pennsylvania v. Kreps, 573 F.2d 811, 820 (3d Cir. 1978), the preliminary injunction, if granted, would have delayed the disbursement of federal funds under legislation promulgated with the purpose of "furnish(ing) prompt economic stimulation to a flagging economy." In all of these cases, the effect on the public interest considered by this Court was not that justice be done, but that specific acts presumptively benefiting the public not be halted until the merits could be reached and a determination made as to what justice required. The public interest was in specific action rather than in the vindication of an abstract principle, and was considered within the confines of disputes involving governmental agencies or programs rather than in the adjudication of private controversies.[12]
 
 
 23
 Furthermore, in balancing the equities to determine whether or not to issue the preliminary injunction, the assessment by the district court here that granting the relief would do no harm to the nonmoving parties apparently caused it to pay insufficient attention to the responsibility of finding irreparable harm to the moving party, Continental, if the interlocutory order were not issued.
 
 
 24
 The trial court appeared to find credible the testimony that Grovijohn did not intend to disclose, and Amoco did not intend to use, any of Continental's confidential information. But the court then proceeded to ascertain the possibility of irreparable harm to Continental from the risk of inadvertent disclosure. Concluding that the nonmoving parties would not be harmed by being enjoined from doing something they did not intend to do, and that the moving party would be harmed if the act enjoined were unintentionally done, the district judge held that the order could properly be granted.
 
 
 25
 Risk of harm if information is inadvertently disclosed, however, is not sufficient to satisfy the standard for granting a preliminary injunction.[13] There must be an imminent threat of the allegedly harmful disclosure.
 
 
 26
 This Court has held that more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," Ammond v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976), or a "presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." Holiday Inns of America, Inc. v. B & B Corporation, 409 F.2d 614, 618 (3d Cir. 1969). In a similar case involving noncompetition and non-disclosure agreements, it was declared to be well-settled law that "(i)njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued 'to restrain one from doing what he is not attempting and does not intend to do.' " Standard Brands, Inc. v. Zumpe, 264 F.Supp. 254, 267-68 (E.D.La.1967) (footnotes omitted).[14]
 
 
 27
 Because there were errors of law in considering and weighing the factors to be evaluated in granting a preliminary injunction as to disclosure of confidential information, we need not consider the other grounds advanced by Amoco for vacating the order.
 
 IV.
 
 28
 Continental argues on its cross-appeal that the district court abused its discretion in denying the motion to preliminarily enjoin Grovijohn from working at an Amoco plant manufacturing PET bottles with an RHB-V machine. Three points are advanced for the assertion that a preliminary injunction should have issued. (1) The noncompetition covenant by its express terms would cover Grovijohn's new employment. (2) The nondisclosure agreement would preclude the new job because its violation, whether intentional or inadvertent, is probable. (3) In the absence of the nondisclosure agreement, Grovijohn would still be under an obligation not to breach the trust Continental reposed in him by revealing confidential information, and disclosure of that information would be inevitable in the position Grovijohn would hold.
 
 
 29
 Points (2) and (3) rest on the threat of disclosure that we have already held to be insufficiently established to justify enjoining, on a preliminary basis, the disclosure itself. It follows that the proof was also insufficient for purposes of interlocutory prohibition of Grovijohn's employment with Amoco. We consider, then, Continental's contention as to the noncompetition agreement.
 
 
 30
 As previously mentioned, the district court found that the RHB-V was within the covenant's reference to "injection blow molding . . . machinery," but that Grovijohn's activity was not prescribed by the agreement because Grovijohn would be involved in manufacturing bottles, not in developing or manufacturing RHB-V machines.
 
 
 31
 Grovijohn agreed not to engage, "directly or indirectly," "in any competitive enterprise," which was specifically defined to "include the development, manufacture, distribution or sale of plastic injection blow molding molds, tools, and machinery, and services incidental thereto."
 
 
 32
 Continental maintains that because Amoco is a competitor of Continental, Grovijohn's employment with the former is forbidden by the obvious terms of the contract. That contract, however, as the district court held, specifically defined "competitive enterprise" in terms of the activity engaged in by the employee. Continental next argues that Grovijohn's activities will inevitably cause him to violate the agreement. But we have been directed to no evidence to convince us that it was erroneous for the district court to find that Grovijohn's activity as manager of a plant manufacturing plastic bottles would necessarily implicate him in the development or manufacture of the RHB-V.
 
 
 33
 We are urged quite vigorously by Continental to follow the decision construing an apparently identical contract in Continental Group, Inc. v. Kinsley, 422 F.Supp. 838 (D.Conn.1976). In that case a development engineer, with expertise in injection blowmolding that had been acquired while in the employ of Continental, was preliminarily enjoined from working as a development engineer for a competitor "engaged in the design, manufacture, and sale of injection blow-molding machinery" whose "current principal objective is development of machinery to produce a plastic bottle for beverages under pressure." Id. at 842. Grovijohn, however, is not an engineer and his work at Amoco concerns the production of bottles, an activity not covered by the noncompetition covenant. Rather, the machinery to make them is covered. The Kinsley court expressly recognized that Kinsley would be "free to apply his knowledge and skills to plastics production, even though he may prefer to work in the development aspects of the industry." Id. at 846. Other cases cited by Continental have also dealt with persons employed as engineers working in product development rather than managers involved in the manufacturing of finished products.[15]
 
 V.
 
 34
 The order of the district court granting a preliminary injunction to enforce the nondisclosure covenant will be vacated, the order denying a preliminary injunction as to the noncompetition agreement will be affirmed, and the cause will be remanded for final consideration of the merits. Costs are to be taxed against Continental.
 
 
 
 [1]
 The trial judge thought it likely that New York law will control the merits of this action, though he noted that the parties had not yet taken a firm position on the point. Amoco has asserted in its brief that New York law should be used to interpret the covenants, since the covenants apparently were signed in that state and since New Jersey, the forum state, applies the lex loci contractus in its choice of law rules. Appellant's Answering Brief on the Cross-Appeal and Reply Brief on the Appeal at 15 n.2 (citing Foley v. Devaney, 528 F.2d 888, 889 n.1 (3d Cir. 1976) (per curiam); Ray v. Beneficial Finance Co., 92 N.J.Super. 519, 530, 224 A.2d 143, 149 (Ch.Div.1966)). This choice of law seems to have been accepted by Continental. Reply Brief on Cross-Appeal of Plaintiff-Appellee at 17, 23. Because our decision is not based on state law, see note 10 infra, we need not express any view at this time on the choice of law issue. See United States v. Dobson, 585 F.2d 55, 57 n.7 (3d Cir. 1978)
 
 
 [2]
 Confidential information was defined by the agreement as follows:
 I hereby recognize that unpublished patentable or unpatentable items of technical or non-technical information such as, but not limited to, materials, tooling, equipment, designs, processes, formulae, projects, products, costs, financial data, marketing plans, customer and supplier lists or business projections used by Continental in its business constitute valuable trade secrets or confidential information (referred to hereafter collectively as "Confidential Information") which are the property of Continental, and I agree not to disclose or use the same other than in the business of Continental.
 
 
 [3]
 The district court has not yet reached the choice of law issue, see note 1, but the covenants entered as exhibits in the record bear the letterhead of Continental's New York office
 
 
 [4]
 RHB appears to be an abbreviation for reheat, blow, and mold. Continental and Amoco are two of seven competitors in the rapidly growing business of manufacturing and selling PET beverage bottles. Both companies, and all but one of their competitors, buy the RHB-V machine from Cincinnati Milacron. The most important competitive advantage claimed by Continental is the ability to make a one-piece bottle. All its competitors make two-piece bottles
 
 
 [5]
 Grovijohn summarized his activities in Kentwood, Michigan as follows:
 When you are in a production situation, your people are responsible or your department is responsible for all the methods of processing, a bottle in this case, and for implementing preventive maintenance programs.
 And it was my job to oversee those activities . . . and to see they were properly administered.
 
 
 [6]
 Continental has charged Amoco with bad motives in hiring Grovijohn, but has never questioned Grovijohn's motives in seeking advancement outside his previous employer
 
 
 [7]
 Paragraph 3 of the order provided:
 Whether on his own account or as an employee of another, defendant Eugene F. Grovijohn is enjoined and restrained from making any disclosure or use, in connection with the manufacture of plastic beverage bottles, of any information acquired by him while in the employ of plaintiff, dealing with materials, tooling, equipment, designs, processes, formulae, projects, products, costs, financial data, marketing plans, customer and supplier lists, or business projections, specifically as follows:
 A. Technical information which makes the RHB-V machine more efficient and extends its life;
 B. Lists of Continental's suppliers of parts used to tool and retool the Cincinnati-Milacron RHB-V machine;
 C. Preventive maintenance programs;
 D. Records on modification and maintenance;
 E. Any information within the scope of the January 3, 1979 secrecy agreement between Continental and Cincinnati-Milacron;
 F. Information concerning Continental's corrective device to deal with the problem of blow-outs and consequent downtime;
 G. Information as to setting up of machines including heater elements;
 H. Information as to the timing and sequence of the application of air pressure;
 I. Cycling time;
 J. Improvements to and substitutions for toggle mechanisms;
 K. Information concerning pallets used to convey the pre-form through the blow molding machine;
 L. Training manuals.
 
 
 [8]
 Paragraph 4 of the order stated:
 Defendant Amoco Container Co. is restrained and enjoined from obtaining from defendant Grovijohn any services he is not allowed to render, . . . or from obtaining from him, or using or disclosing, any of the information described in par. 3 hereof. The prohibition against disclosure or use shall apply to such information as may be inadvertently disclosed to it by Grovijohn, as well as to information disclosed other than inadvertently. . . .
 
 
 [9]
 One scholar has elaborated this point as follows:
 The court need not consider every harm resulting from an erroneous preliminary decision, but only harm that final relief cannot redress. If the final judgment can remedy the plaintiff's injuries, there is no occasion to grant immediate protection which may turn out to have been based on error. Likewise, if the defendant's injuries from what turns out to be an erroneous injunction can be redressed later, there is no reason to deny interim relief otherwise warranted. Not even all irreparable harm, but only irreparable harm to legal rights, should count.
 Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525, 541 (1978).
 
 
 [10]
 Accord, e. g., Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 600-01 (3d Cir. 1979); Constructors Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 814-15 (3d Cir. 1978); A. O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir. 1976)
 "Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions." Systems Operations v. Scientific Games Development Corp., 555 F.2d 1131, 1141 (3d Cir. 1977) (citing 11 C. Wright & A. Miller, Federal Practice and Procedure § 2943, at 390-91 (1973)). State law would define what injury is cognizable and would control any assessment of the moving party's probability of success on the merits, see id., but we decide neither of these issues on this appeal.
 
 
 [11]
 Accord Constructors Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978); Glasco v. Hills, 558 F.2d 179, 180 (3d Cir. 1977); Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975); see Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); Brown v. Chote, 411 U.S. 452, 457, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); Delaware River Port Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d 917, 920 (3d Cir. 1974)
 
 
 [12]
 It is not suggested that the vindication of principles of law is not in the public interest, but only that this is not what has been meant in holding that the district courts should consider the public interest when that factor is relevant to the grant or denial of interlocutory relief
 
 
 [13]
 Continental Group, Inc. v. Kinsley, 422 F.Supp. 838 (D.Conn.1976), does not hold to the contrary. In that case, only the noncompetition covenant was before the district court. By applicable New York law, the covenant was enforceable "only when necessary to protect against use or disclosure of trade secrets or other confidential information." Id. at 843. To ascertain Continental's likelihood of prevailing on the merits, the court was therefore required to determine whether any risk of disclosure would exist if a former design engineer of Continental's was employed in a similar capacity by another company producing the same product. The court's finding of a possibility of inadvertent disclosure is distinguishable from this case as to both fact-finding and legal standards. First, risk of a design engineer's disclosure of manufacturing secrets does not establish an equivalent risk for a plant manager. Second, the risk of disclosure necessary for establishing the enforceability of a noncompetition covenant is not equivalent to, or as stringent as, the probability of irreparable harm that is required to support a preliminary injunction
 
 
 [14]
 Accord Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp., 255 F.Supp. 645, 654 (E.D.Mich.1966) ("A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue.")
 
 
 [15]
 See Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp., 255 F.Supp. 645 (E.D.Mich.1966); B. F. Goodrich Co. v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99 (1963); Emery Ind., Inc. v. Cottier, 202 U.S.P.Q. (BNA) 829, 831 (S.D.Ohio Aug. 18, 1978) (chemical engineer involved in research, design, manufacturing, and marketing of product)