**CITIES SERVICE COMPANY, a Delaware corporation, Cities Acquisition Company, a Delaware corporation, and Charles J. Waidelich, Plaintiffs,**

v.

**MESA PETROLEUM CO., a Delaware corporation, and T. Boone Pickens, Defendants.**

Civ. A. No. 82–327.

United States District Court, D. Delaware.

June 16, 1982.

Martin P. Tully, A. Gilchrist Sparks, III, Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Wachtell, Lipton, Rosen & Katz, New York City, for plaintiffs.

Charles F. Richards, Jr., R. Franklin Balotti, Allen M. Terrell, Jr., Jesse A. Finkelstein, Richards, Layton & Finger, and Robert K. Payson, Gregory A. Inskip, John E. James, Potter, Anderson & Corroon and Rodman Ward, Jr., Edward P. Welch, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendant Mesa Petroleum Co.

## OPINION

STAPLETON, District Judge:

Each of the two principals in this Williams Act case seeks to acquire control of the other through a tender offer and to

fend off the hostile tender for its own stock. The principal plaintiff is Cities Service Company, a Delaware corporation, which, together with its wholly owned subsidiary, Cities Acquisition Company, is referred to herein as "Cities". The principal defendant is Mesa Petroleum Co., also a Delaware corporation, ("Mesa").

Cities is currently seeking a preliminary injunction in connection with Mesa's June 7, 1982 tender for "up to" 15% of Cities Service's outstanding common stock at $45 per share (hereinafter "Mesa's 15% $45 offer"). Specifically, Cities seeks a preliminary injunction requiring Mesa:

(a) to postpone the expiration of the proration period for Mesa's partial tender offer for Cities' shares (currently scheduled for 12:00 Midnight, New York City time, on Wednesday, June 16, 1982) until the withdrawal deadline of such offer (currently stated to be 12:00 Midnight, New York City time, on Friday, June 25, 1982),

(b) to make appropriate corrective disclosures with regard to certain alleged Mesa misrepresentations,

(c) to permit plaintiffs to disclose to the Securities and Exchange Commission and the investing public certain evidence adduced in discovery, and

(d) for such other relief as to this Court appears just and proper.

Although Cities alleges an array of unlawful activities under the federal securities laws,* the thrust of plaintiffs' claims charges that Mesa violated Section 14(e) of the Securities Exchange Act of 1934 through false statements and manipulative activities in connection with Mesa's offers for Cities' stock. Cities' claims arise in the context of three Mesa transactions: its "friendly 46% $50 offer", its "15% $45 offer", and its "By-law Amendment".

While the war between Cities and Mesa has been going on for some time, the current battle was triggered by Cities' announcement on May 28, 1982 of its intention to make a cash tender offer for 51% of the outstanding common stock of Mesa at $17 per share.** Cities states that its offer was in response to a "planned" offer by Mesa to purchase an amount of Cities' stock at $42 per share which, when added to the 5% Mesa already held, would give it control of Cities. Mesa responded on May 31, 1982 by proposing to Cities' management a "friendly" offer for 46% of Cities' common stock at $50 per share.[1]

Cities alleges that Mesa's friendly 46% $50 offer was an effort to obstruct Cities' offer until such time as Mesa could get the financing together to make its own hostile tender offer for a majority of Cities' shares. Cities further claims that Mesa did not have financing to support its friendly 46% $50 offer, but made statements to the press on June 1 and June 4, 1982 indicating that it did.

When it became apparent that Cities' Board of Directors would not embrace Mesa's "friendly" 46% $50 offer, Mesa made a tender offer to Cities' stockholders on June 7, 1982, for "up to" 12,100,000 shares (15%) of Cities' common stock at $45 per

---

* The motion for a preliminary injunction alleges violations of Sections 7, 9, 10(b), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g, 78i, 78j(b), 78n(d) and 78n(e).

** Cities commenced its tender offer on June 1, 1982.

1. The confirming letter of May 31, 1982 summarized the terms of the proposal as follows:

I am pleased to confirm by this letter the offer of which I informed Mr. Waidelich in our telephone conversation on May 31, 1982 under which Mesa Petroleum Co. will acquire Cities Service Company on an agreed basis in a business combination transaction or trans-

actions in which the stockholders of Cities Service will receive $50 per common share.

We would expect that the combination will be carried out either by means of a cash election merger at $50 per share or by a two-step transaction in which the first step will consist of a cash tender offer by Mesa at $50 per share for a number of shares which, together with the stock already held by Mesa, will constitute a majority of the voting power of Cities Service. Thereafter, the Cities Service stock remaining outstanding will be acquired for common stock, or a combination of common stock and senior debt, of Mesa designed to have a value of $40 per Cities Service share.

share. Here also, Cities claims that Mesa has made misrepresentations concerning the financing for this offer which are "designed to manipulate the market." Cities further alleges that Mesa's 15% $45 offer is a "tender now—finance later" scheme intended to "coerce" the tender of 46% of Cities' stock and thereby to attract the financing, presently unavailable, which is necessary to purchase control of Cities.

Finally, Cities claims that the repeal of a Mesa by-law provision is further evidence of Mesa's efforts to mislead the investing public. On June 6, 1982, Mesa's Board of Directors voted to repeal a Mesa by-law provision permitting special meetings of the stockholders to be called "upon the written request of stockholders holding of record at least one-third of the outstanding shares of stock of the corporation entitled to vote at such meeting." The alleged purpose of such a repeal was to bar Cities—even if it were to acquire 46% or more of Mesa's stock—from calling a special meeting of Mesa's shareholders to effectuate its control. Although Mesa's Board rescinded the by-law amendment on June 10, 1982, Cities maintains that this is an insufficient cure.

■ The standard for preliminary injunctive relief in this Circuit is well-established:

[T]his Court has consistently identified four factors which must be examined in ascertaining the propriety of a preliminary injunction: ... the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120 (3d Cir. 1980), *quoting Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir. 1978) (citations and footnotes omitted). *See also Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980); *Wright v. Columbia University*, 520 F.Supp. 789 (E.D. Pa.1981); *Alaska Interstate Co. v. McMillian*, 402 F.Supp. 532 (D.Del.1975).

While these four factors set the bounds of the Court's inquiry, "no one aspect will necessarily determine [the] outcome. Rather, a proper judgment entails a 'delicate balancing' of all elements." *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d at 815 (3d Cir. 1978); *see also Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 920, 923–24 (3d Cir. 1974). Thus, the Court in *Constructors Association of Western Pennsylvania v. Kreps* stated:

... in a situation where factors of irreparable harm, interests of third parties and public consideration strongly favor the moving party, an injunction might be appropriate even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required. In contrast, where the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of an injunction, greater significance must be placed upon the likelihood that the party will ultimately succeed on the merits of the litigation.

573 F.2d at 815 (3d Cir. 1978).

■ After study of the existing record, I remain unpersuaded that Cities has a likelihood of success on the merits. Moreover, I believe a weighing of the relevant interests counsels against an award of the relief which Cities seeks.

The relevant issues can quickly be narrowed. As Cities concedes, it does not violate the Williams Act (1) to tender for 15% of the outstanding stock of a target company, (2) to make such a tender in the hope that stock constituting control will be tendered in response, or (3) to reserve the right to purchase tendered stock in excess of 15% if additional financing can be obtained for that purpose. What makes Mesa's pending

15% tender illegal in Cities' view is that Mesa, through its statements in connection with the friendly tender and its repetition of those statements in its offer for 15%, has created the illusion in the marketplace that Mesa currently has available to it sufficient financing to purchase the remaining 46% of Cities' stock it needs for control. By creating this illusion and thus misleading the market, Mesa, according to Cities, will induce an over tender which, in turn, will permit it to obtain the needed additional financing, which it could not raise without that manipulation. Accordingly, with the exception of its by-law amendment claim discussed hereafter, Cities' case on the merits of its preliminary relief application rises or falls on whether the present record indicates that Mesa has misled the market about the financing currently available to it to purchase Cities' stock.

The short answer to Cities' claims with regard to this core issue is Mesa's June 7, 1982 offering materials (the "Offer"). Those materials state that the $550,000,000 necessary to finance the purchase of up to 15% is "expected to be borrowed pursuant to a credit agreement to be entered into among Mesa and a group of banks," including nine named banks. They then go on to detail the expected terms of this credit. The record contains no basis for questioning the accuracy of any of this information and Mesa announced the closing of the credit agreement on June 11, 1982.[2]

More importantly, the Offer expressly addresses the subject of financing for possible purchases of shares above the 15% level. At the outset of the Offer, for example, it is emphasized:

Mesa expressly reserves the right to purchase pursuant to the Offer more than, 12,100,000 Shares if more than such number of Shares is properly tendered and not withdrawn. However, any purchase by Mesa of significantly more than such number of Shares would require Mesa to obtain financing in excess of the amounts currently available. Mesa intends to seek, although there can be no assurance that it will obtain, such additional financing. See Section 11. Any such purchase of additional Shares would require, among other things, the consent of Mesa's lending banks. See Section 9.

On the next page, the Offer reiterates:

Mesa expressly reserves the right to purchase pursuant to the Offer more than 12,100,000 Shares. However, any purchase by Mesa of significantly in excess of 12,100,000 Shares would require Mesa to obtain financing in excess of the amounts described in Section 9. Mesa intends to seek, although there can be no assurance that it will obtain, such additional financing. In addition, any such purchase of additional Shares would require, among other things, the consent of Mesa's lending banks.

With respect to the purpose of the Offer, the materials further represent:

*Purpose of the Offer.* The purpose of the Offer is to enable Mesa to acquire for cash a significant equity interest in the Company. If Mesa purchases 12,100,000 Shares pursuant to the Offer, Mesa will own approximately 20% of the outstanding Shares. Mesa intends to seek additional financing and, if successful, and if more than 12,100,000 Shares are tendered pursuant to the Offer, Mesa may purchase additional Shares pursuant to the Offer. Such additional financing for the Offer may be sought from independent entities that would make equity or debt investments in Mesa, as well as from banks and other lending institutions. Arrangements for such financing could involve commitments to sell oil and gas properties, interests in oil and gas properties or other assets of Mesa or, be contingent upon the acquisition of the entire equity interest in the Company by Mesa, of the Company. Mesa has recently discussed with potential investors financing

---

2. Cities contends that the Offer failed to disclose that the financing necessary to acquire 15% of Cities' stock at $45 was not available on June 7, 1982 in that no credit arrangements were actually completed. As indicated in the text, however, the Offer did not represent that the agreement had been closed and is not otherwise misleading on this point.

arrangements involving equity investments in Mesa and commitments to sell assets; however, there are currently no arrangements relating to any such transactions. Mesa intends to seek, although there can be no assurance that it will obtain, such additional financing.

Cities cannot seriously contest the accuracy of any of the above-quoted information. It suggests, in effect, however, that Cities' stockholders have been conditioned to discount and disbelieve these representations. This assertion rests almost entirely on the fact that the Offer under the section entitled, "Contacts with the Company, Background of the Offer," [3] reviews Mesa's friendly tender and the press releases of Cities and Mesa in connection therewith. Mesa's friendly tender letter was set forth in haec verba, as was its June 4th press release in response to Cities' charge that the Offer was merely "a rather weak tactical maneuver." Cities charges that this background, together with Mesa's representation that it was still willing to negotiate a friendly deal at $50 a share, leads Cities' stockholders to believe, despite Mesa's express denials, that the financing which was said to be available for the 46% friendly offer remains available for the purchase of 46% under the hostile offer. I think it highly unlikely that a stockholder would draw such an inference.

First, it cannot fairly be said that the Offer invites such an inference. It makes a clear distinction between the financing situation with respect to the friendly offer and that with respect to the hostile one.

Moreover, I am not persuaded that the Offer's treatment of the friendly offer conveys a misleading impression about the financing available with respect to it, much less with respect to the hostile offer. Mesa's confirming letter of May 31, 1982, made public in its June 1st press release, does not represent that financing for the friendly offer is in place, and, if anyone drew that inference, originally or from reading the offer, his or her impression would have been dispelled by Mesa's June 4th press release. That release reports:

> T. B. Pickens, Jr., President and Chairman of the Board of Mesa Petroleum Co., responded today to claims by Cities Service Company that Mesa would not be able to arrange financing for its previously announced $50 per share proposal to acquire Cities Service in a friendly transaction.
>
> * * * * * *
>
> Mr. Pickens stated that Mesa conferred with its commercial and investment bankers with respect to the availability of financing for the cash portion of the friendly acquisition proposal before making the proposal. Mr. Pickens further stated that senior officers of such commercial and investment banking firms had indicated prior to Mr. Pickens' call to the Chairman of Cities Service that in their opinion financing for the cash portion of Mesa's $50 per share friendly acquisition proposal would be available.

While this release does not confess any sin in connection with Mesa's earlier release, to me it conveys the message (1) that financing for the friendly offer was not in place, (2) that Cities was maintaining that it could not be obtained, but (3) that Mesa had a basis for believing that such financing could be obtained. While Cities contests the accuracy of the third part of this message, I am unpersuaded by the present record that it is misleading.

The financial press seems to have gotten this message. Nothing is reported which indicates that anyone believed financing for the friendly offer was in place. The press does reflect several significant things, however. On June 7, 1982 the Wall Street Journal quoted a Mesa financial advisor as saying that "no agreements with partners have been completed up to this time;" noted that Mesa would need financing it didn't currently have to purchase more than 15% pursuant to the hostile tender; and pointed out that "a proration pool containing more than half of Cities Services' stock would become a powerful aid in ... [Mesa's] ef-

---

**3.** *See* SEC Reg. § 240.14d–100.

forts to obtain further financing." The report concluded by characterizing Mesa's reference to its friendly offer in its hostile one as "a thinly veiled way of telling Cities Services' shareholders that they can get $50 if they can persuade management to go along, but only $45 if they can't."

In short, I don't read Mesa's press releases and offering statement as misleading on the subject of the financing currently available to Mesa for the purchase of Cities' shares. Indeed, the record as a whole suggests that Mesa's releases and Offer have apprised those in the market of precisely what is in fact going on.

It is, of course, conceivable that Cities will ultimately be able to show that Mesa had no good faith belief in its ability to finance its friendly offer. I think the chances of that happening are sufficiently small, however, that they do not justify an intrusion by the Court into the processes of the market. If the Offer is oversubscribed, the tendered shares may have been tendered in part in the hope that Mesa will secure sufficient financing to purchase 46%. If that financing is forthcoming, the Cities' stockholders have a substantial interest in seeing their hope realized. If that financing does not materialize and Cities' prediction of a "bidding war" for Cities' stock ensues, the Cities' stockholders may have an interest in that eventuality as well. In the meanwhile, I conclude that Mesa's hostile offer should go forward on the schedule it has selected, a schedule consistent with the Williams Act's weighing of the competing interest of tenderor, target, and target stockholders.

 Cities' claim with respect to Mesa's by-law amendment is of more substance. It asserts that the amendment deleting the special meeting provisions of Mesa's by-laws was intended as a defensive maneuver to keep Cities from gaining control for a substantial period of time even should it acquire a controlling interest in Mesa. This is both true and apparent from Mesa's offer which revealed as follows:

The Offer to Purchase relating to the Company Offer states that, if the Company acquires a sufficient number of shares of Mesa common stock, the Company intends to call a special meeting of the Mesa stockholders for the purpose of taking action designed to effectuate the Company's objective of exercising control over Mesa. On June 6, 1982, the Board of Directors of Mesa amended the Mesa by-laws to delete a provision not required by the Delaware Law which gave the holders of record of at least one-third of the outstanding shares of Mesa voting stock the right to call a special meeting of stockholders.

\* \* \* \* \* \*

Even if the Company were to acquire a majority of the voting power of Mesa, Mesa believes that the Company would not be able to acquire control of Mesa's Board of Directors before the second annual meeting of Mesa's stockholders following such acquisition because of provisions in Mesa's Certificate of Incorporation and in the Delaware General Corporation Law. See Section 10. Mesa's present directors intend to continue in office even if the Company acquires a majority of the voting power of Mesa.

Cities contends that, despite this disclosure, the amendment is nevertheless a manipulative device, citing *Mobil v. Marathon Oil*, 669 F.2d 366 (6th Cir. 1981). I need not reach that issue at this point, however. The Cities' board has rescinded its action and has announced that fact publicly. The fact of the rescission has been reported over the broad tape and in the Wall Street Journal. Both that publicity and the character of the information conveyed support the inference that the rescission is common knowledge in the marketplace. While it is possible that some Cities' stockholders have been exposed to Mesa's Offer and not to the ensuing publicity, I assess that risk as minimal and, in the overall context of the Mesa Offer, conclude that it is not substantial enough to warrant interim relief.

In its briefing, Cities did not identify which information it is which it wishes to disclose to the SEC. If it wants to pursue

that relief further it may do so. Cities' application for a preliminary injunction with respect to Mesa's activities is denied.